**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Brian Patrick SMITH,**
**Defendant-Appellant.**

**No. 405, Docket 83–1276.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1983.

Decided Jan. 26, 1984.

Steven Kimelman, New York City, for defendant-appellant.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Appellant Smith appeals from a judgment, dated July 13, 1983, of the United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge,* convicting him, after a jury trial, on eight counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff (1982), and on nine counts of wire fraud in violation of 18 U.S.C. § 1343 (1982). Smith was sentenced to concurrent terms of imprisonment of one year and one day on one count of securities fraud and one count of. wire fraud, respectively. Imposition of sentence on the remaining counts was suspended and Smith was placed on probation for five years consecutive to the prison term imposed.

On appeal, Smith contends that the district judge erred in (1) including in his instructions to the jury a charge on aiding and abetting under 18 U.S.C. § 2 (1982) as to counts one through eight since the indictment did not allege aiding and abetting and in effect the government did not argue that Smith had violated that section, (2) admitting against Smith certain similar act evidence pursuant to Fed.R.Evid. 404(b) and 403, and (3) permitting the introduction of extrinsic evidence during the government's cross-examination of Smith. We do not find these contentions meritorious and, therefore, we affirm the judgment of conviction.

## I. BACKGROUND

The evidence presented at trial, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), indicates that Smith, a former licensed stockbroker, engaged in a "free-riding" scheme designed to defraud certain United States and Canadian individuals and broker-dealers. The government argued at trial that Smith

Gregory J. Wallance, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for plaintiff-appellee.

fraudulently purchased or caused others to purchase on credit large amounts of stock in Jupiter Development Corporation ("Jupiter"), a Canadian company involved in oil and gold exploration, without Smith having the intent or ability to pay for the Jupiter stock unless it went up in price.

In May, 1979, Smith entered into an agreement with Jupiter to assist the company in raising funds through a private placement of Jupiter stock. As compensation, Smith received 30,000 shares of Jupiter stock plus an option to buy 100,000 more Jupiter shares at a price of $1.10 a share.[1] Smith hoped to drive up the price of Jupiter stock so that eventually he could exercise his stock options at a sizeable profit. To cause the Jupiter stock price to rise, he purchased or caused others to purchase the stock on credit, thus contributing to an artificially high price for the stock, which permitted him to generate further credit to make additional purchases. All the while, he recognized that he would be able to meet his original commitments only if the price of Jupiter shares continued to rise. When the inflated price of the stock collapsed, Smith's credit dried up and he found himself unable to pay for the Jupiter securities he had ordered or had caused to be ordered in his name or for other persons. As a consequence, the financial loss was borne by the broker-dealers rather than by himself.

Smith's scheme involved two types of transactions. The first consisted of certain purchases with "bad checks" occurring at the New York City offices of E.F. Hutton & Co., Inc. ("E.F. Hutton") between February and May of 1980. Most of these orders were placed through Robert Grenley, a young broker in E.F. Hutton's broker training program. In February, 1980, Smith established an account in his own name.[2] Thereafter, he referred several of his relatives, friends and acquaintances to Grenley, all in connection with Jupiter stock purchases. He also offered to buy Jupiter stock for the E.F. Hutton accounts of several of Grenley's friends, assuring them that they could repay Smith when the price of the stock went up. He also told Grenley that his (Smith's) friends had authorized him to make Jupiter stock purchases for their E.F. Hutton accounts. Payment for most of these Smith-induced purchases, which accounted for over 100,000 Jupiter shares, was in the form of approximately twenty-two of Smith's personal checks for about $500,000, drawn on Smith's accounts at the Toronto Dominion Bank and the Bank of Nova Scotia in Toronto, Canada.

Smith's checks, which were written at different times between February and May, 1980, were drawn on Canadian bank accounts and consequently took four to six weeks to clear. All along, he failed to disclose to E.F. Hutton that he did not have sufficient funds to cover the checks.[3] Yet, during the clearing period, he transferred to Canadian margin accounts some of the Jupiter stock (which appeared to be fully paid for since the bad checks had not yet been returned unpaid) held in various E.F. Hutton accounts he controlled. Through the margin accounts, Smith was able to pledge the transferred shares as collateral for additional loans from Canadian brokers to buy more stock. Smith also used the transferred stock to borrow funds to cover the first batch of bad checks payable to the order of E.F. Hutton amounting to roughly $100,000.

In mid-May, 1980, however, other bad checks, for about $400,000, were returned to E.F. Hutton unpaid due to insufficient funds. That same week, the Alberta Securities Exchange in Canada had reopened trading in Jupiter stock after trading had been suspended for approximately four weeks. Despite heavy activity, the price of Jupiter stock commenced its precipitous fall

1. *See infra* note 14 and accompanying text.

2. In October, 1979, Smith had opened an E.F. Hutton account in his mother's name and through Grenley had begun buying Jupiter stock on credit for that account.

3. Even after the last group of checks, written in May, 1980, were returned unpaid, Smith kept insisting to E.F. Hutton officials that he had enough funds to cover the checks and that "it's incredible that they could have bounced."

during that week. Smith was unable to make further purchases to support the price, and was denied additional credit from the Canadian margin accounts to cover the last wave of bad checks to E.F. Hutton. In short, the "bad checks" part of Smith's scheme fell apart.

The second set of transactions, which can be termed the "no check" purchases, took place during the week of May 12, 1980. As the price of Jupiter stock started to plummet, and as Smith found himself cut-off from his credit lines, he placed orders at three West Coast broker-dealer firms (E.F. Hutton's Los Angeles office, Black & Company, Inc., and Belford, Hammerbeck, Inc.) for approximately 37,000 shares of Jupiter stock at a cost in excess of $250,000, without disclosing to the broker-dealers that the only way he would be able to pay for these massive orders would be if the price of Jupiter stock stopped falling and in fact began to rise. At this point, Smith was without funds and without access to further credit. One of the firms informed Smith that it would not place all the orders requested by him and that some of the orders it would place would come from the firm's inventory of Jupiter stock. Smith was displeased that these orders would not be placed through the Alberta Securities Exchange, where they might have had a more direct impact on the price. Despite Smith's last-minute buying spree, the price of Jupiter collapsed. Smith never paid the West Coast broker-dealer firms for those orders which they did place.

On November 10, 1982, an indictment was filed against Smith in the Eastern District of New York, charging him with eight counts of securities fraud and nine counts of wire fraud. Even though the indictment did not include an aiding and abetting charge under 18 U.S.C. § 2, Judge Nickerson, at the government's request, and over defendant's objection, included such an instruction in his charge to the jury. After a jury trial of more than two weeks, Smith was convicted on all 17 counts. Upon re-

view, we find Smith's contentions of error without merit and we affirm the judgment of conviction.

## II.  DISCUSSION

### A.  Aiding and Abetting Charge.

The indictment against Smith did not charge him with aiding and abetting in the commission of securities fraud pursuant to 18 U.S.C. § 2. At the government's request and over Smith's objection, however, Judge Nickerson instructed the jury that "[t]he guilt of the defendant with respect to counts one through eight may be established without proof that he personally did every act constituting the offense charged if he aided or abetted another in commiting a crime." [4]

The well established rule in this and other circuits is that a "defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor." *United States v. Tropiano,* 418 F.2d 1069, 1083 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); *see, e.g., United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir.1975) ("the absence of a reference in the indictment to 18 U.S.C. § 2 does not bar the conviction on this count"); *United States v. Pellegrino,* 470 F.2d 1205, 1209 (2d Cir.1972) (citing *United States v. Tropiano), cert. denied,* 411 U.S. 918, 93 S.Ct.. 1556, 36 L.Ed.2d 310 (1973); *United States v. Bullock,* 451 F.2d 884, 888 (5th Cir.1971) ("one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted"); *Levine v. United States,* 430 F.2d 641, 643 (7th Cir.1970) (collecting cases), *cert. denied,* 401 U.S. 949, 91 S.Ct. 962, 28 L.Ed.2d 232 (1971). An aiding and abetting jury instruction is appropriate where the prosecution makes it known that it intends to proceed on a theory of aiding and abetting and the evidence so warrants. *United States v. Taylor,* 464 F.2d 240, 242 n. 1 (2d

**4.** Defendant does not argue that the district judge gave an erroneous aiding and abetting charge. Rather, he claims the charge should not have been given at all.

Cir.1972). A principal purpose of the first requirement is to avoid unfair surprise to the defendant. The second requirement assures that the government will continue to carry the burden of proving the crime.

In the instant case, appellant objects to the aiding and abetting charge on two grounds. First, he claims that it was unfair on the district judge's part to give such a charge where the government had proceeded throughout most of the trial as though Smith had acted by himself. Second, he argues that even if there were sufficient evidence to convict him of the substantive offense, the evidence did not warrant an aiding and abetting charge.

Smith's first contention, which effectively raises a claim of unfair surprise, is incredible, given that it was *his* litigation posture which prompted the government to request the instruction.[5] At trial, Smith took the stand and testified in his own defense; he also presented more than a dozen witnesses. A substantial portion of his case was aimed at showing that it was Robert Grenley, rather than appellant, who actually committed the frauds.[6] This strategy is illustrated by the following colloquy between the district judge and Smith's counsel:

THE COURT: I don't see the relevancy [of certain evidence about Grenley's activities] . . . .

. . . .

Either he committed—Mr. Smith committed a fraud or he didn't.

COUNSEL: I think the issue is Mr. Grenley committed the fraud here, not Mr. Smith.

THE COURT: Both of them could participate in it—

COUNSEL: I think I should be able to prove to the jury it was Mr. Grenley who perpetrated the fraud.

. . . .

THE COURT: So what. Let's assume that he was committing a fraud and he did commit a bunch of frauds.

COUNSEL: The Government's posture is he is an [in]-experienced broker who did nothing

. . . .

THE COURT: What difference would that make whether he was naive or not? He could be a very cynical fellow and taking all the advice from Smith and had done all of this on his own. I don't see it.

In response to this exchange, the Assistant United States Attorney ("AUSA") notified the district judge and defense counsel that he "may seek an aiding and abetting charge in this case, depending on how Mr. Smith's testimony goes." After Smith's direct testimony, which stated in effect that Grenley was the actual manipulator of the Jupiter stock, the government again suggested that the aiding and abetting charge might be appropriate as "an alternative theory." The judge noted that "there's evidence in the record from which it can certainly be inferred that Mr. Smith could be held as an aider and abettor, procurer or inducer of a fraud . . . ." Later in the proceedings, the AUSA again reminded the court and defense counsel of the applicability of an aiding and abetting charge.[7] Then, in his rebuttal summation, the AUSA argued to the jury that,

[i]n any event, I submit, Ladies and Gentlemen, if you conclude that either Robert Grenley was assisting Brian Patrick Smith in . . . Smith's commission of the fraud, that that does not exonerate . . . Smith or, if you conclude it was the rev-

---

5. Smith's contention that he was unfairly surprised by the government's "belated" adoption of the aiding and abetting theory is further refuted by the record, which indicates that the government gave timely notice that it might seek the aiding and abetting charge. The first indication was given by the government on June 1, 1983—the day on which the defense opened its case. The defense did not rest its case until June 6, 1983.

6. See, for example, Trial Tr. 155–452 (defense counsel's cross-examination of Grenley), Trial Tr. 1216–23 (defense counsel's direct examination of Michael Anthony Sofia, E.F. Hutton Vice President), Trial Tr. 1889–1957 (defense counsel's summation).

7. Trial Tr. 1876.

erse, that ... Smith was aiding in some way whatever Robert Grenley was supposed to be doing, knowingly aiding and doing it for his own benefit, I submit to you that does not exonerate ... Smith.

This sequence of events and statements belies the claim that appellant was unfairly surprised or prejudiced by the aiding and abetting jury instruction because such a charge was not included in the indictment.

Smith's second contention is that the evidence did not warrant giving the aiding and abetting charge.[8] Smith does not argue that there was insufficient evidence from which the jury could infer wrongdoing on Grenley's part.[9] Rather, he argues that there did not exist substantial evidence from which the jury could conclude that Smith aided, abetted or caused the fraud committed (as contended by Smith at trial) by Grenley, and consequently the aiding and abetting charge was inappropriate.

The record, however, indicates otherwise. For example, one investor testified that Smith had told him that if he ordered additional Jupiter stock through Grenley, he would "cut a check for [Grenley] from Canada."[10] Moreover, after another investor complained of Jupiter stock bought for his account which he had not ordered, he was told by Smith that "he would help [Grenley] out and he was going to pay for the stock. He was going to help Grimley [sic] out."[11] Similarly, a third investor was told by Smith that he "really shouldn't worry and just listen to [Grenley]."[12] Thus, there was abundant evidence from which the jury could have found that even if the securities frauds were committed by Grenley, as Smith contended at trial, Smith associated himself with the venture, and knowingly sought to make it succeed and thus was guilty of aiding and abetting. *See United States v. Pellegrino,* 470 F.2d at 1209.

**B.** *Similar Act Evidence.*

Smith's next contention on appeal is that the district judge erred in admitting certain similar act evidence against Smith pursuant to Fed.R.Evid. 404(b) and 403. At issue is evidence which indicated (1) that Smith misappropriated Jupiter stock owed to certain investors who participated at Smith's insistence in a private placement of Jupiter stock, (2) that Smith caused those investors to file false documents with the Alberta Securities Commission regarding the extent of their participation in the private placement,[13] and (3) that Smith, in payment of stock options received by him pursuant to the private placement,[14] had written Jupiter a worthless check drawn on an account which previously had been closed.

Although evidence of similar acts "is not admissible to prove the character of a person in order to show that he acted in conformity therewith," such evidence may be "admissible for other purposes, such as proof of motive, opportunity, intent, prepa-

---

**8.** Contrary to Smith's suggestion, the aiding and abetting charge was not in any way inconsistent with, or contradictory to, the substantive crime alleged in the indictment. *See United States v. Bullock,* 451 F.2d at 888; *United States v. Tropiano,* 418 F.2d at 1083.

**9.** At trial, defense counsel stated that "there is evidence in the record, certainly through cross-examination ... [from which] the jury can infer Mr. Grenley committed one or more frauds on his employer." Trial Tr. 1813.

**10.** Trial Tr. 615 (testimony of William Jefferson Marshall).

**11.** Trial Tr. 652 (testimony of Morton Manes).

**12.** Trial Tr. 1431 (testimony of Joseph Santo).

**13.** The evidence showed that the Alberta Securities Commission had permitted Jupiter to make the private placement only to investors who purchased a minimum of $25,000 of units. Smith, operating as placement salesman for Jupiter, sold units to about 47 investors, some of whom invested as little as $600. To hide this violation from the Alberta Securities Commission, Smith had certain of the investors sign and file documents which exaggerated the number of units they had purchased.

**14.** Jupiter had hired Smith as a salesman for its private offering and had compensated him with options to purchase Jupiter stock at a cost to him of $1.10 per share. The check in question was for $22,000 drawn on Smith's personal account, which had previously been closed by bank officials because of Smith's checks to E.F. Hutton which had been returned unpaid.

ration, plan [or] knowledge . . . ." Fed.R. Evid. 404(b). Even so, the evidence is proper only as long as "its probative value is [not] substantially outweighed by the danger of unfair prejudice . . . ." Fed.R.Evid. 403; *United States v. Siegel,* 717 F.2d 9, 16–17 (2d Cir.1983).

The district judge bears the responsibility of weighing the probative value of similar act evidence against the potential for undue prejudice. *United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982). Since the trial judge is in the best position to evaluate the evidence and its effect on the jury, he is given broad discretion in making the ruling. *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983); *United States v. Leonard,* 524 F.2d 1076, 1092 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). His ruling "on admissibility . . . will not be overturned on appeal absent a clear showing of abuse of discretion." *United States v. Jamil,* 707 F.2d at 642; *United States v. Moon,* 718 F.2d 1210, 1233 (2d Cir.1983); *United States v. Albergo,* 539 F.2d 860, 863 (2d Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976). To find abuse, the appellate court must conclude that the district judge acted arbitrarily and irrationally. *United States v. Carson,* 702 F.2d 351, 368 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Birney,* 686 F.2d at 106.

Herein, the similar act evidence was relevant under the criteria set forth in Fed. R.Evid. 404(b). First, such evidence was indicative of Smith's state of mind. At trial, Smith claimed that he did not have the intent to commit the acts charged in the indictment and that instead he was the victim of other brokers (mostly Grenley) and of market forces. Thus, the similar acts evidence—which according to the government indicated that Smith misappropriated Jupiter stock owed to certain investors in the Jupiter private placement, caused others to file fraudulent statements with the Alberta Securities Commission, and paid for certain Jupiter stock options with a worthless check—was directly relevant under Fed.R.Evid. 404(b) as to Smith's knowledge of, and intent to, commit the frauds charged in the indictment. *See United States v. Birrell,* 447 F.2d 1168, 1172 (2d Cir.1971) ("[e]vidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent"), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 675, 30 L.Ed.2d 675 (1972).

The similar act evidence was also relevant to show a "common scheme or general plan." *United States v. O'Connor,* 580 F.2d 38, 41 (2d Cir.1978). For example, the private placement permitted Smith, via the options and the stock compensation, to accumulate a large block of Jupiter stock. The stock options had a dual purpose. On the one hand, he could use them to generate credit for further purchases. On the other hand, they promised to make him a great profit if he were able to drive up the price of Jupiter stock (by purchasing or causing others to purchase the stock without having the ability himself to pay for the orders) before exercising the stock options. Thus, the similar act evidence at issue, which shed light upon important elements of Smith's scheme, served to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place." McCORMICK ON EVIDENCE § 190, at 448 (2 ed. 1972), *quoted in United States v. O'Connor,* 580 F.2d at 41.

The question remains, however, whether the probative "value of the evidence is 'worth what it costs.'" *United States v. Leonard,* 524 F.2d at 1091 (quoting McCOR-MICK ON EVIDENCE § 185, at 438 (2 ed. 1972)). The issue of unfair prejudice was presented to the district judge several times. In a pre-trial memorandum of law, the government argued that the similar act evidence of fraud was not unduly prejudicial since it did not involve violence or conduct likely to arouse irrational passions. *See United States v. Leonard,* 524 F.2d at 1091 (evidence of fraud is "hardly the equivalent of a bloody shirt . . . [or] a dying accusation of poisoning") (citations omitted). At various times during the trial,

defense counsel objected to the introduction of the similar act evidence as being unfairly prejudicial. Judge Nickerson considered but rejected those arguments. Moreover, both during trial[15] and in his charge to the jury,[16] he took care to minimize any potential improper prejudicial effect by instructing the jury about the correct purpose and use of the similar act evidence. *See United States v. Birney,* 686 F.2d at 106.

In short, we conclude that the district judge did not abuse his discretion in finding that the probative value of the similar act evidence outweighed any potential prejudice to defendant.

### C. *Extrinsic Evidence on Cross-Examination.*

Smith's final contention is that the district judge erred in permitting the introduction of certain extrinsic evidence about similar acts during the government's cross-examination of Smith. He contends that such use of extrinsic evidence was contrary to the limitations set out in Fed.R.Evid.

608(b).[17] Specifically, Smith complains of the introduction of extrinsic evidence by the government during its cross-examination of Smith about (1) his alleged fraud on the Alberta Securities Commission, (2) his alleged fraud on certain Jupiter investors, (3) his alleged fraud on Jupiter,[18] and (4) his alleged misappropriation of stock in connection with a private placement for Consolidated Gold-Sec ("Gold-Sec"), another Canadian company.

As to the first three items, it is sufficient to note that they were introduced pursuant to the district judge's ruling under 404(b).[19] Consequently, it was not improper to prove those similar acts by extrinsic evidence. However, the fourth item, Smith's misappropriation of stock in connection with the Gold-Sec private placement, was admitted solely for Fed.R.Evid. 608(b) purposes.[20] As such, it was an error to permit the introduction of extrinsic evidence in connection therewith. However, it is our view that the error was harmless given the strength of the government's evidence

---

**15.** During the government's summation, the district judge reminded the jury that,

I have allowed [the similar acts evidence], but only for two purposes; that is, as they bear on the intent of the defendant, or as they bear on his credibility. In other words, the evidence of a person's character or a trait of character is not admissible for the purpose of proving that he acted in conformity therewith.

Trial Tr. 1832–33.

**16.** He reiterated in the jury instructions that,

You have heard certain evidence having to do with activities of the defendant other than those charged in the indictment. The defendant is not on trial for such activities, and you may not consider evidence of the defendant's character or a trait of his character to prove that he acted in conformity therewith. In other words, if you find that defendant committed dishonest acts other than those charged in the indictment, you may not use that evidence as proof that his character was such that he therefore made the false statements or misleading omissions charged in the indictment. You may consider this evidence of other acts only for the following two purposes. If you find that the defendant's other conduct showed a character for truthfulness or untruthfulness, then you may consider it in determining the credibility of the defendant's testimony in this case. Secondly, if you find beyond a reasonable doubt, from the

evidence about the acts charged in the indictment, that the defendant made false statements or misleading omissions as the indictment alleges, then you may consider the evidence of other acts in decising [sic] whether or not the defendant made or omitted those statements knowingly and with the intent to defraud.

Trial Tr. 2019–20.

**17.** Fed.R.Evid. 608(b) provides, in relevant part,

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness....

**18.** *See supra* notes 13 and 14 and accompanying text.

**19.** *See supra* notes 15 and 16 and accompanying text.

**20.** In permitting cross-examination on the point, the district judge stated that he would "allow [it] under Rule 608(b), as bearing on his credibility." Trial Tr. 1609.

against Smith, and the negligible prejudice, if any, the Gold-Sec evidence might have caused. *See United States v. Lyles,* 593 F.2d 182, 196 (2d Cir.) (error harmless given the overwhelming evidence of guilt), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *see also Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (nonconstitutional error harmless if it "did not influence the jury, or had but a very slight effect"); *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977) (error "is harmless if it is 'highly probable' that the error did not contribute to the verdict"). Consequently, this harmless error does not warrant reversal of Smith's conviction.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of conviction.