**UNITED STATES of America, Appellee,**

v.

**Melvin BLUM, Defendant–Appellant,**

**Charles Monteleone, Defendant.**

**No. 1592, Docket 94–1622.**

United States Court of Appeals, Second Circuit.

Argued May 31, 1995.

Decided Aug. 2, 1995.

Steven K. Frankel, New York City (Barry M. Fallick, Frankel Pariser & Rudder, New York City, of counsel), for appellant.

Martin Coffey, Asst. U.S. Atty., E.D.N.Y., Brooklyn (Zachary W. Carter, U.S. Atty., Susan Corkery, Asst. U.S. Atty., E.D.N.Y., Brooklyn, of counsel), for appellee.

Before: MESKILL, McLAUGHLIN and LAY,* Circuit Judges.

MESKILL, Circuit Judge:

Appellant Melvin Blum appeals from a judgment of conviction of the United States District Court for the Eastern District of New York, Mishler, *J.* The jury convicted

---

* Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designa-   tion.

Blum on five counts of a six count indictment alleging that Blum obstructed an investigation of the United States Environmental Protection Agency (EPA), principally through the submission of a false document to that agency. For the reasons set forth below, we affirm in part and reverse in part.

## BACKGROUND

Melvin Blum was the president and principal of Burlington Bio–Medical and Scientific Corporation (Burlington), a manufacturer and distributor of various chemical products including Ro–Pel Animal, Rodent and Bird Repellant (Ro–Pel). On June 14, 1989 Vincent Palmer, a Pesticide Controller Specialist II and Case Review Officer of the New York State Department of Environmental Conservation (DEC), conducted an unannounced inspection of Burlington's facilities in Farmingdale, New York. Palmer was responding to a complaint from one of Burlington's competitors that Burlington had circulated a false and misleading advertisement claiming that Ro–Pel, a pesticide, was "non-hazardous and safe." Palmer testified that at this inspection he met with Blum, who informed him that no production of Ro–Pel occurred at its Farmingdale facility. Rather, Blum explained that the pesticide was formulated at a Burlington plant in Ohio and then sent to Reliance Packaging, Inc. (Reliance) in New Jersey for packaging. Blum further informed Palmer that the Farmingdale facility was solely responsible for the distribution of Ro–Pel, which was exported primarily to foreign markets. Believing that no production or packaging of Ro–Pel took place at the Farmingdale site, Palmer terminated the interview.

Under 7 U.S.C. § 136e, any establishment producing a pesticide must register with the EPA. In order to aid in the monitoring, inspection and tracking of pesticides, the EPA assigns such registrants an "establishment number." Establishment numbers may be obtained on request from the EPA at no cost to the manufacturer, but the manufacturer must possess a number for each facility involved in the production of a pesticide. Additionally, the manufacturer also must obtain a "product registration number" for each

pesticide it produces. *See* 7 U.S.C. § 136a. Under the statute no pesticide may be sold, manufactured or distributed without both numbers prominently displayed on a product's label. *See* 7 U.S.C. § 136j.

Subsequent to his first interview with Blum, Palmer purchased a bottle of Ro–Pel at a retail outlet. Palmer testified that not only did the sample bear an invalid establishment number, but the label indicated that the product was manufactured in Farmingdale, contrary to Blum's previous assertion. Additionally, after contacting Reliance Palmer discovered that no Ro–Pel ever had been packaged at their facilities in New Jersey. As a result of this contradictory information, Palmer arranged for a second on-site inspection of Burlington's Farmingdale facilities.

On July 26, 1989 Palmer and Ernest Schmaltz, an EPA Case Review Officer, conducted the second inspection of Burlington's Farmingdale facility and met with Blum and another Burlington employee, David Borovsky. Notwithstanding Blum's previous statement that Burlington did not manufacture Ro–Pel at its Farmingdale location, Palmer and Schmaltz were shown a full production facility. Blum explained that Burlington began producing Ro–Pel at the Farmingdale facility on June 22, 1989, eight days after Palmer's initial interview. As part of their investigation the two inspectors also reviewed Burlington's records relative to the manufacture of Ro–Pel, including a production logbook that contained such pertinent information as the quantities of raw materials acquired for the production of Ro–Pel, the dates of production, the amounts of Ro–Pel formulated, and the lot numbers assigned to each particular batch. The logbook confirmed that production at the Farmingdale facility did not begin until June 22, 1989. Significantly, however, the bottle of Ro–Pel purchased by Palmer nearly one month earlier listed Farmingdale as the place of manufacture. In response to Schmaltz's questioning on this point Blum once again asserted that prior to June 22, 1989, the company manufactured Ro–Pel in Ohio, with Reliance packaging the product in New Jersey.

Following the July inspection Borovsky left Burlington for another job. Subsequent-

ly, Borovsky contacted EPA Special Agent Christopher Lillard, notifying him that Blum had deceived Palmer and Schmaltz during the second on-site inspection of Burlington, as the logbook examined by the two men was bogus. Borovsky explained that Blum had directed him to purchase a blank production logbook prior to the July 26 inspection and further instructed him to create entries to make it appear that all production of Ro–Pel at Farmingdale occurred after June 22, 1989. Borovsky then turned over the bogus production log to Lillard along with Burlington's Ro–Pel sales records, indicating that Burlington had been producing Ro–Pel at its Farmingdale location for several years prior to the June 14 inspection.

Following the meeting with Borovsky the government executed a search warrant at Burlington's Farmingdale facility. EPA agents seized the genuine production logbook, which reflected that Burlington began manufacturing Ro–Pel in 1983, six years prior to the date the company obtained an establishment number for its production. The EPA also determined, based on the logbook and the sales records supplied by Borovsky, that Burlington understated the quantities of Ro–Pel produced from 1988 to 1990 in pesticide production reports submitted to the EPA. Thereafter, Blum was indicted on charges of conspiring to obstruct, and obstructing, an EPA investigation in violation of 18 U.S.C. §§ 371, 1505 and 3551 (Counts I and II); making false statements to Palmer and Schmaltz during the course of the investigation in violation of 18 U.S.C. § 1001 (Count III);[1] causing Borovsky to produce the false production logbook in violation of 18 U.S.C. § 1001 (Count IV); filing false production reports with the EPA in violation of 18 U.S.C. § 1001 (Count V); and producing a pesticide without an establishment number in violation of 7 U.S.C. §§ 136e, 136j and 136l (Count VI).

The government's theory at trial was that Blum initially lied to Palmer about the production of Ro–Pel at Burlington's Farming-

dale plant, and then attempted to cover up that falsehood by directing Borovsky to fabricate the production logbook. Thus, the government's case centered on Borovsky's testimony regarding the creation of the false production logbook.

Borovsky testified as follows. Prior to the July 26, 1989 inspection Blum informed him that the company was having a problem with the DEC. Specifically, Blum maintained that an inspector of that agency was on the payroll of a competitor that wanted to steal the confidential formula for Ro–Pel. Blum further told Borovsky that they needed to "throw [the inspector] off track." Therefore, Blum instructed Borovsky to purchase a new production logbook and create false entries for it as to the dates and amounts of Ro–Pel produced by Burlington. Blum, moreover, directed him to indicate that all production occurred after June 22, 1989. Borovsky then testified that on completion of the fabricated logbook Blum reviewed it, wrinkling and spilling coffee over it to make it appear "old." Blum further directed Borovsky to "white out" some of the entries "to make it look more real." According to Borovsky Blum's final instructions were that if Borovsky was asked for Burlington's production logbook on the date of the inspection he was to hand over the bogus logbook, which, of course, he did.

Blum's counsel vigorously challenged Borovsky on cross-examination, primarily by attacking his credibility. For example, it was established that Borovsky had been passed over for a promotion and demoted by Blum. Defense counsel further elicited from Borovsky that he was a user of cocaine and LSD and that he also had supplied both his girlfriend and her uncle with drugs while he worked for Blum. Additionally, Borovsky admitted that he received kickbacks from certain chemical suppliers. But Blum's most significant challenge to Borovsky's damaging testimony was intended to suggest that Borovsky falsified the production logbook for

1. Specifically, the indictment charged Blum made the following false statements to Palmer and Schmaltz: (1) that Ro–Pel was not produced at Burlington's Farmingdale facility, (2) that Burlington's Ohio facility formulated the prod-

uct, (3) that Ro–Pel was produced primarily for foreign distribution, (4) that Burlington had a valid establishment number for Ro–Pel, and (5) that packaging occurred at Reliance in New Jersey.

his own reasons and without Blum's knowledge. Specifically, Blum attempted to introduce the testimony of two witnesses that there were major misappropriations of supplies and materials at Burlington during Borovsky's tenure as production manager, thus providing Borovsky with an incentive to falsify the logbook to hide his own defalcations.

The government objected to the admission of this evidence, arguing that it was barred by Fed.R.Evid. 608, which prohibits the introduction of extrinsic evidence of misconduct or wrongful conduct to prove a witness' character. At oral argument before the district court on this issue Blum's counsel countered that:

> This isn't a question of accusing [Borovsky] of a crime by collateral means, this is the reason the books and records were created, Your Honor. It goes right to the heart of this case.
>
> The government said ... the reason Borovsky created this [false logbook] was solely because Melvin Blum wanted to deceive the EPA and DEC. We have the absolute motive and we can show it by books and records of the company.... [W]e can show there was clearly a motive to deceive and create phony books and records that had nothing to do with the EPA and DEC. This is not a question of criminal activity. It may be interpreted as that. This is the motive to create the very books, the foundation of the indictment and the charges against Mr. Blum.

The district court nevertheless sustained the government's objection and excluded the evidence. Moreover, the court ruled that even were the evidence admissible it would only serve to confuse the issues for the jury, thus refusing to permit any testimony concerning Borovsky's possible thefts under Fed.R.Evid. 403 as well.

The jury then returned guilty verdicts on Counts I, II, III, IV and V. With respect to Count III, making false statements during the course of the EPA investigation, the district court provided the jury with special interrogatories, in which they indicated that the government had proved only one of the false statements charged: Blum's claim that Reliance packaged Ro–Pel at their facilities in New Jersey. Further, the jury found Blum not guilty of knowingly producing a pesticide without an establishment number (Count VI). The district court sentenced Blum to five months incarceration, to be followed by five months of home detention, two years of supervised release, a fine of $10,000, and a $250 special assessment. Blum remains free pending this appeal.

## DISCUSSION

Whether rooted in the Due Process Clause of the Fifth Amendment or in the Compulsory Process Clause of the Sixth Amendment, the Constitution guarantees criminal defendants the right to present a defense. *See United States v. Almonte*, 956 F.2d 27, 30 (2d Cir.1992); *see also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). Such a right, however, must be balanced against a court's leave to set reasonable limits on the admission of evidence. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir.1995). Thus, judges are accorded "wide latitude" in excluding evidence that poses an undue risk of "harassment, prejudice [or] confusion of the issues" or evidence that is "repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *see also Holmes*, 44 F.3d at 1157. Accordingly, we review the district court's evidentiary decision under an abuse of discretion standard. *See Holmes*, 44 F.3d at 1157; *United States v. Moon*, 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

The district court gave two rationales for excluding the evidence of Borovsky's potential defalcations from Burlington. First, the court opined that the testimony was extrinsic evidence of wrongful conduct introduced for the limited purpose of attacking Borovsky's credibility as a witness, and thus barred by Rule 608. *See* Fed.R.Evid. 608(b); *see also United States v. Smith*, 727 F.2d 214, 221 (2d Cir.1984) (holding it error to admit extrinsic

evidence of witness' misappropriation of stock solely for impeachment purposes). Additionally, the district court excluded the proffered testimony on the ground that its potential for confusing the issues before the jury "substantially outweighed" its relevance. Fed.R.Evid. 403.

■ We disagree on both accounts, finding that neither Rule 608(b) nor Rule 403 provides a sufficient basis for refusing to allow the testimony into evidence. First, we do not share the district court's view that Blum attempted to introduce this evidence primarily to impeach Borovsky's credibility. Martin Rothbard, Burlington's accountant, and William Mintz, the company's chief operating officer, both were prepared to testify that a substantial misappropriation of supplies and raw materials occurred during Borovsky's tenure as production manager. Additionally, the two would have testified that Borovsky solely was responsible for ordering supplies at Burlington and keeping the company's production records, thereby allowing the jury to infer that Borovsky pilfered supplies and raw materials while at Burlington. Although this evidence certainly reflects on Borovsky's credibility, that was not its intended purpose, and Blum's counsel stated as much in his proffer to the district court. Rather, what the evidence sought to demonstrate was that Borovsky had a personal motive to fabricate the production logbook having nothing to do with Blum's plight, i.e., to cover up his own thefts. As evidence directly relevant to showing motive it plainly was admissible under Fed.R.Evid. 404(b). See Fed.R.Evid. 404(b) (permitting admission against third parties of evidence of "crimes, wrongs, or acts" if used to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); see also United States v. Aboumoussallem, 726 F.2d 906, 911–12 (2d Cir.1984) (holding Rule 404(b) mandates admission of evidence of similar acts probative of third party's intent, motive, common scheme or plan for the purpose of proving defendant's lack thereof).

■ Nor do we believe the evidence was inadmissible under Rule 403. If accepted by the jury, proof of Borovsky's motive to create the false production logbook not only would support Blum's claim that he did not direct Borovsky to do so, but would bolster his entire defense that he did not attempt to hide the production of Ro–Pel at Burlington's Farmingdale facilities from the EPA. "Indeed, given the importance of the ... testimony to the defense, whatever confusion ... that may have resulted from its admission would have to have been overwhelming to satisfy Rule 403's balancing test." United States v. Harvey, 547 F.2d 720, 723 (2d Cir. 1976). Importantly, introduction of this testimony would not have diverted the jury's attention from the central issue of Blum's guilt or innocence; rather, it would have aided the jury in making this ultimate determination. The proffered testimony thus posed no realistic threat of confusing the issues before the jury, let alone one which presented a danger of "substantially outweigh[ing]" the evidence's probative value. Fed.R.Evid. 403. Accordingly, we hold that the district court abused its discretion in precluding its admission.

■ Our inquiry does not end here, however. We must also determine whether the district court's error in refusing to admit the proffered evidence was so prejudicial to Blum that it requires reversal of his convictions. The district court's ruling is subject to "harmless error" analysis. Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986); United States v. Pedroza, 750 F.2d 187, 197 (2d Cir.1984); see Kotteakos v. United States, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (holding error not harmless unless court can conclude with fair assurance that it did not substantially influence jury).

The bogus production logbook supplied by Borovsky, and his testimony accompanying its introduction, were the crucial pieces of evidence with respect to the counts of obstruction of, and conspiracy to obstruct, an EPA investigation (Counts I and II), directing Borovsky to create the false production logbook (Count IV), and filing false pesticide production reports with the EPA (Count V).[2]

---

2. The government maintained at trial that Blum

falsified the pesticide production reports filed

Throughout the trial the government placed repeated emphasis on Blum's need to hide the production of Ro–Pel at Farmingdale, and his meeting this need by directing Borovsky to create the false logbook. The government also continually suggested that Blum's claim that he did not have any knowledge of Borovsky's actions was whimsical, there being no evidence that Borovsky possessed any other reason to falsify Burlington's production records. For instance, the government argued in its summation:

> Now [Blum] has to try to reconcile what has been going on in Burlington for the last couple years. How can I reconcile my production of pesticides? ... Then it dawns on him and he realizes there is going to be another inspection, I got to have [sic] a logbook. So he [gets] Borovsky.

And again, in rebuttal, the government stated:

> [T]his defendant, ... by creating at his direction a bogus logbook, sought to disguise the fact that he was a producer.... Why? Because his motive was simple. He didn't want to be regulated.... [H]e didn't want that regulation of his product from cradle to grave, whether it be arrogance, laziness, whatever, it was an intentional decision on his part and he had the perfect foil in David Borovsky.

Rothbard's and Mintz's proffered testimony provided the only independent evidence buttressing Blum's proffered defense—that Borovsky fabricated the logbook on his own, rather than at Blum's command, to hide his own thefts from Burlington. Given that Blum's defense went to the core of the prosecution's case, we cannot view the exclusion of the testimony as harmless. *See United States v. Forrester,* 60 F.3d 52, 64–65 (2d Cir.1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless.") (citing *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir.1987)). We thus reverse the convictions on Counts I, II, IV and V and remand for a new trial on these counts.

■ The jury's finding on Count III that Blum made a false statement during the

course of the EPA's investigation, namely, that Reliance packaged the Ro–Pel in New Jersey, is unaffected by the district court's erroneous exclusion of the proffered evidence. The evidence admitted at trial relating to the falsity of that claim, coming from sources other than the phony logbook, was overwhelming. For instance, Daniel Fixell, executive vice-president at Reliance, testified that the company never packaged Ro–Pel for Burlington. Since the excluded testimony, if properly admitted, would have had no impact on the outcome of Count III, we find the error of the district court harmless beyond a reasonable doubt as to that count. *See Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1437–38. Accordingly, we affirm Blum's conviction on Count III.

### CONCLUSION

For the foregoing reasons we affirm Blum's conviction on Count III, reverse with respect to Counts I, II, IV and V, and remand for further proceedings not inconsistent with this opinion. We thus vacate the judgment of conviction and remand for re-sentencing on Count III should the government decide not to retry Blum on any of the remaining counts.

with the EPA to coincide with the information contained in the phony logbook.