UNITED STATES of America, Appellee,

v.

John M. PURDY, Jr., Defendant–Appellant.

No. 96–1817.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1998.

Decided June 10, 1998.

242

Alan M. Dershowitz, Cambridge, MA (Victoria B. Eiger, Dershowitz & Eiger, P.C., New York City, Jacob D. Zeldes and Brian E. Spears, Zeldes, Needle & Cooper, P.C., Bridgeport, CT, of counsel), for Defendant–Appellant.

Mark G. Califano, Assistant United States Attorney (Christopher F. Droney, United States Attorney for the District of Connecticut, of counsel), New Haven, CT, for Appellee.

Before: VAN GRAAFEILAND and WALKER, Circuit Judges, and RAKOFF, District Judge.*

RAKOFF, District Judge.

In the idiom of economic crime, a "kickback" is a kind of commercial bribe. "Typically, they are payments made by one business to employees of another in order to induce favorable commercial treatment from [the employees'] company." H.R.Rep. No. 99–964, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5962. In 1946, Congress—concerned that employees of prime

* Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

contractors on certain government procure-
ment contracts were being bribed to enter
into inflated subcontracts for which the gov-
ernment ultimately paid—passed the Anti–
Kickback Act, 41 U.S.C. §§ 51–58, to bring
such conduct within the purview of federal
prosecution. *See* H.R.Rep. No. 79–212
(1945), *reprinted in* 1946 U.S.C.C.S. 1081.
In 1960, Congress amended the Act so as to
apply to all negotiated federal contracts, and
in 1986, amended it again so as to apply
generally to "all Federal contracts" and thus
"to enhance the government's ability to pre-
vent and prosecute kickback practices" that
in any way touched the federal procurement
process. H.R.Rep. No. 99–964, at 4, 1986
U.S.C.C.A.N. at 5961.

Appellant John M. Purdy, Jr. would now
have this Court read the amended statute,
contrary to its language, history, and pur-
pose, to preclude prosecution of any kick-
back-paying subcontractor who did not con-
sciously intend to defraud the government
itself. We decline the invitation and affirm
appellant's conviction and sentence.

Purdy was President and Chief Executive
Officer of The Purdy Corporation ("Purdy
Co."), which regularly supplied helicopter
parts to the Sikorsky Aircraft Division of
United Technologies Corporation ("Sikor-
sky"). Sikorsky in turn sold the assembled
helicopters to a variety of customers, includ-
ing the United States government. Between
May 1989 and August 1990, Purdy paid tens
of thousands of dollars in bribes to two Si-
korsky purchasing agents, Alexander Bevvi-
no and Bruce Cafasso, in order to obtain
increased Sikorsky business for Purdy Co. Of
the twenty-two or more purchase orders ob-
tained thereby, at least seven related to gov-
ernment contracts on which Sikorsky was the
prime contractor. The bribes only ceased
after Purdy learned that Sikorsky employees

were being investigated for receiving kick-
backs.

Purdy and a confederate, Martin Ferris,
were indicted thereafter, pursuant to 18
U.S.C. § 371,[1] for conspiring with the Sikor-
sky purchasing agents to violate the Anti–
Kickback Act. After a ten-day trial before
the Hon. Janet Bond Arterton, United States
District Judge, and a jury, Ferris was acquit-
ted and Purdy was convicted. On December
11, 1996, Judge Arterton sentenced Purdy to
thirty-seven months in prison, three years of
supervised release, a period of community
service, and a $250,000 fine.

■ As his primary point on appeal, Pur-
dy contends that conviction of conspiracy to
violate the Anti–Kickback Act requires proof
that the defendant specifically intended to
obtain favorable treatment on government-
related contracts, whereas the proof at trial
showed only that Purdy intended to obtain
Sikorsky business in general and was insuffi-
cient to show a specific intent to obtain gov-
ernment-related business. Because we dis-
agree with the initial premise, we do not
reach the issue of the sufficiency of the evi-
dence.

The gravamen of the instant offense is not
a conspiracy to defraud the government,
which Congress outlawed decades before the
Anti–Kickback Act.[2] Rather, from the outset,
the purpose of the Anti–Kickback Act was to
reach beyond intentional frauds perpetrated
directly on the government and to secure the
subcontracting of government-related con-
tracts from commercial bribery. *See gener-
ally* H.R.Rep. No. 79–212 (1945).

As the Congress that enacted the 1946 Act
recognized, the government, though not di-
rectly defrauded, ultimately pays for such
commercial bribery as occurs at the subcon-
tracting level. Since many "prime contrac-
tors are reimbursed by the United States for

---

1. 18 U.S.C. § 371 reads, in pertinent part: "If
two or more persons conspire either to commit
any offense against the United States, or to de-
fraud the United States, or any agency thereof in
any manner or for any purpose, and one or more
of such persons do any act to effect the object of
the conspiracy, each shall be fined under this
title or imprisoned not more than five years, or
both." Purdy and Ferris were indicted (under
the first clause) for conspiring to commit a feder-

al offense, to wit, violation of the Anti–Kickback
Act, rather than (under the second clause) for
conspiring to defraud the United States.

2. *See* the second clause of 18 U.S.C. § 371 (not
here utilized), *supra* n. 1, criminalizing any con-
spiracy "to defraud the United States." *See gen-
erally* Abraham Goldstein, *Conspiracy to Defraud
the United States*, 68 Yale L.J. 405 (1959).

the cost of all subcontracts and purchase orders performed thereunder, the Government undoubtedly bears the ultimate costs of such fees, commissions, and gratuities without receiving any benefit therefrom." *Id.* Congress therefore sought to punish all those whose commercial bribery had an adverse impact on the federal treasury, regardless of whether their intent was only to defraud their immediate customer. If, in the process, deterrence was extended not only to those who specifically contemplated the government relationship in their fraud but also to other commercial bribers who thereby assumed the risk that their wrongful deeds might result in federal prosecution, so much the better.

The 1960 and 1986 amendments of the Anti–Kickback Act sought to broaden its coverage even to instances of bribery not directly impacting the federal treasury. As the House Committee that authored the 1986 amendment stated: "Whatever form they take, all kickbacks serve to undermine Federal procurement.... Furthermore, inflated contract pricing is not their only effect. Kickback activity corrupts the Federal procurement system. It drives out honest competitors and destroys the markets in which the government must bargain." H.R. Rep. No 99–964, at 5 (1986), 1986 U.S.C.C.A.N. at 5962. Accordingly, Congress substantially rewrote the statute in 1986 with the express purpose of extending the scope of the statute to any commercial bribery occurring anywhere within the federal procurement system. *See id.* at 10.

The language of the amended statute lays bare this purpose. The section defining "Prohibited conduct" makes it unlawful, without qualification, for any person "to provide, attempt to provide, or offer to provide any kickback" or "to solicit, accept, or attempt to accept any kickback." 41 U.S.C. § 53. "Kickback," in turn, is defined as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or reward-

ing favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract." *Id.* § 52(2). Since "prime contractor" means "a person who has entered into a prime contract with the United States," *id.* § 52(5), and "subcontractor" means any other person "who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract," *id.* § 52(8), the result is to impose liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment.

Purdy, however, argues that an offender must have the more specific purpose of obtaining favorable treatment on a government-related contract (tantamount to a specific intent to defraud the government). To support this interpretation, he would, first, interpret the word "purpose" in § 52(2) to modify everything in the definition of "kickback" that follows thereafter, making the language about "in connection with a prime contract or ... subcontract" part of the intent element rather than simply an objective requirement in its own right. Second, Purdy would modify the intent requirement to include language that forms no part of § 52(2) itself but can only be found in the further definition of "prime contract," to wit, "a contract or contractual action entered into by the United States." 41 U.S.C. § 52(4).

This strained interpretation—which would create an additional, artificial burden to effective implementation of a statute Congress sought to broaden and streamline—finds no support in either the other language of the statute or the purpose of the law. Rather, it is directly refuted by the pertinent legislative history, which states that the "purpose" language "is intended to expand the coverage of the existing Act to kickbacks made in the Federal procurement process for any improper purpose," H.R.Rep. No. 99–964, at 11 (1986), 1986 U.S.C.C.A.N. at 5968, and is not intended, as Purdy argues, to narrow the preexisting interpretations of the Act that did not make knowledge of any of the terms

of the prime contract an element of liability, *see Hanis v. United States,* 246 F.2d 781, 784–86 (8th Cir.1957). Indeed, the Committee Report expressly treats the portion of the definition of kickback relating to connection with a prime contract or subcontract *not* as part of the "purpose" provision but rather as "intended to ensure the Act's broad coverage over kickbacks that may be made by subcontractors who are in any contractual relationship related to the performance of the government's prime contract." H.R.Rep. No. 99–964, at 12 (1986), 1986 U.S.C.C.A.N. at 5969.

■ In short, kickbacks made at any point in the government procurement process for the purpose of improperly obtaining favorable treatment are prohibited by the Act, regardless of whether or not the offender knew of the government involvement. *Cf. United States v. Feola,* 420 U.S. 671, 684, 95 S.Ct. 1255, 1263, 43 L.Ed.2d 541 (1975) (defendant need not know that victim a federal officer to be guilty of assaulting a federal officer within 18 U.S.C. § 111). It follows from this conclusion that Purdy's claim that the evidence was insufficient to establish his intent to obtain government-related business is entirely irrelevant. There is no dispute that some of the subcontracts embraced within his conspiracy were in fact connected to prime contracts with the United States, and that is sufficient to bring Purdy within the Anti–Kickback Act. Likewise, Purdy's fallback argument, that Judge Arterton failed to instruct the jury adequately as to his "defense" that he was indifferent as to whether his kickback-procured contracts were government-related or not, is likewise irrelevant, for it was not a lawful defense.[3]

Purdy also assigns as error the district court's refusal to let him call as a witness one Carol Voss, an agent of the Defense Contract Audit Agency, who had assisted the Government in preparing its case and who would have testified, according to Purdy, that only

seven of the twenty-two purchase orders that the Government contended were the fruits of the conspiracy related to prime contracts with the United States. While this fact was already before the jury through other evidence, Purdy argues that the testimony of a Government agent on this issue would have: (i) corroborated Purdy's defense that he had no specific intent to procure government-related business; (ii) impeached the credibility of a material Government witness, Bevvino, who had testified that some of the other fifteen orders might also be government-related; and (iii) impugned the "integrity" of the prosecution's case.

■ Although a defendant has the burden of alerting the court to his theory of relevance, *see United States v. Scotti,* 47 F.3d 1237, 1248 (2d Cir.1995), the first of these three arguments was not squarely raised before the district court and the second, although raised, was promptly abandoned. Indeed, when queried by Judge Arterton as to the relevance of Voss's proffered testimony, defense counsel responded that "[t]he important thing is I think for ruling on this point is can [defendant] show a lack of integrity in the Government's case." District courts are entitled to hold counsel to their representations of what is important. Accordingly, we think the first two relevancy arguments were not preserved for appeal.

■ Even if Purdy had not waived these two arguments, however, the first argument—that Voss's testimony would have supported Purdy's defense that he had no intent to procure government-related business—is rendered moot by our holding above that no such defense is legally cognizable. It also follows that any value the Voss testimony would have had for Purdy's second purpose—the impeachment of Bevvino's testimony that many of the twenty-two purchase orders were government-related—would relate to a collateral issue. Extrinsic evidence

---

3. Purdy's only other appellate objection to Judge Arterton's jury charge—that the charge on statute of limitations failed to convey adequately his theory of defense on this aspect—is likewise unavailing. As Purdy concedes, the charge was "technically *accurate.*" The only portion of Purdy's requested charge on limitations that the

district court declined to give was his one-sided summary of the evidence on this issue, which he argued to the jury on summation, thus fully apprising the jurors of how the defense believed the court's charge should be applied to the facts of the case.

offered for impeachment on a collateral issue is properly excluded. *See, e.g., Berkovich v. Hicks,* 922 F.2d 1018, 1025 (2d Cir.1991); *Atlas Marine Co. v. Forsikrings–Aksjeselskapet Norske Triton,* No. 92 Civ. 4746(RPP), 1995 WL 498822, at *6 (S.D.N.Y. Aug. 22, 1995).

■ Purdy's third argument—that the jury was entitled to hear Voss's testimony in order to assess whether the Government's investigation and the ensuing prosecution were conducted with "integrity"—would, if accepted as a general rule, replace the focused, truth-seeking processes of federal jury trials with invitations to rampant speculation and prejudicial diversion. In support of his claim that such testimony should be admitted for such a purpose, Purdy places heavy reliance on dictum in *United States v. GAF Corp.,* 928 F.2d 1253 (2d Cir.1991). This reliance is misplaced.

In *GAF,* this Court found error, given the "unusual history and circumstances of [the] case," in the trial court's ruling that the defendant, who was being prosecuted for the third time, was not entitled to introduce a bill of particulars from the first of his trials that was inconsistent with the position the Government took at the third trial. *Id.* at 1255. The *GAF* Court stated:

> We think that the same considerations of fairness and maintaining the integrity of the truth-seeking function of trials that led this Court to find that opening statements of counsel and prior pleadings constitute admissions also require that a prior inconsistent bill of particulars be considered an admission by the government in an appropriate situation.

*Id.* at 1260. *GAF* is plainly distinguishable from the case at hand. Whereas the bill of particulars at issue in *GAF* was a binding legal admission by the Government, here the Government made no prior admission that Voss's testimony would have confirmed or contradicted. The Government's theory of how many of the twenty-two purchase orders related to government contracts may have changed over the course of its investigation, but an earlier investigative theory is hardly the equivalent of a bill of particulars or other formal admission in an earlier trial. To bind

the Government forever to a preliminary investigative theory to which it never formally committed would only discourage further investigation and thereby impede the truth-finding process.

Here, the Government, having allegedly begun with the belief that all twenty-two purchase orders were related to prime Government contracts, narrowed its approach by the time of trial to the contention that only seven of the purchase orders in question were definitely so related (although it still maintained that others were inferentially so related). Nothing in this modest narrowing of the Government's approach—which did not contradict a single prior representation made by the Government to the district court—opened the door to defense proof of the Government's having previously entertained a broader theory.

■ Moreover, even assuming *arguendo* that Voss's testimony were admissible for the foregoing purpose, Judge Arterton's ruling could not be deemed reversibly erroneous, as "judges are accorded 'wide latitude' in excluding evidence that poses an undue risk of 'harassment, prejudice [or] confusion of the issues' or evidence that is 'repetitive or only marginally relevant.'" *United States v. Blum,* 62 F.3d 63, 67 (2d Cir.1995) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)); *see also* Fed.R.Evid. 403. In the instant case, evidence of how the Government's ultimate theory had been narrowed from its initial theory would merely have distracted the jury from the central issues of the case and from its fact-finding functions. In short, under any analysis, the exclusion of Voss's testimony provides no ground for reversal on appeal.

■ Purdy next claims that the district court's dismissal of one of the jurors constitutes reversible error. On the fourth day of trial, defense counsel alerted the court that a person who had been present in the courtroom during the trial had approached both Purdy's wife and Purdy's co-defendant Ferris, identified himself as the husband of a juror named Stallman, and expressed views that were sympathetic to the defense. Judge

Arterton then questioned juror Stallman, who stated that she did not know her husband had spoken to Ferris or Mrs. Purdy and that she had not discussed the case with him. Although Judge Arterton indicated that she did not have reason to doubt the veracity of these responses, she discharged juror Stallman, over Purdy's objection, and replaced her with an alternate. In so doing, the district court noted that the juror's husband had been present in the court when evidence was discussed out of the jury's hearing and stated that "the risk of a mistrial in this case is so evident from the nature of the juror's husband's communications, which go to the essence of his belief on the merits or purpose of this case, and it just defies any reasonable view of human nature to think that [the husband] is not going to convey in some way or another to this juror his views, and conceivably the existence of evidence that has not been admitted in this case."

After the district court excused this juror and inquired whether any relatives of other jurors were present in the courtroom, the husband of another alternate juror, Vars, responded that he was staying to watch the proceedings. Judge Arterton told him that he had a right to be there, cautioned Mr. Vars and alternate juror Vars not to discuss the case with each other, and proceeded with the evidence. Alternate juror Vars never became a full member of the jury and thus played no part in the jury's deliberations.

Purdy argues that the district court should have handled juror Stallman the same way that it handled juror Vars—by cautioning her again not to discuss the case—or should have taken steps short of discharge, such as the sequestration of the jury. According to Purdy, the discharge of Stallman prejudiced him significantly, both because of the "interest of an accused in retaining a chosen jury," *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978) (dictum), and because the Government was probably eager to have juror Stallman removed because of the risk that she independently held views similar to those held by her husband.

■ District courts, however, have broad discretion under Federal Rule of Criminal Procedure 24(c) to replace a juror at any time before the jury retires if there is reasonable cause to do so, and a reviewing court will only find abuse of that discretion where there is "bias or prejudice to the defendant." *United States v. Gambino,* 951 F.2d 498, 503 (2d Cir.1991) (internal quotation marks omitted); *see also United States v. Agramonte,* 980 F.2d 847, 850 (2d Cir.1992) (per curiam). "Prejudice" in this context exists when the discharge is without "factual support, or for a legally irrelevant reason." *United States v. Fajardo,* 787 F.2d 1523, 1525 (11th Cir.1986) (quoting *United States v. Rodriguez,* 573 F.2d 330, 332 (5th Cir.1978)) (internal quotation marks omitted).

Here, the situations of juror Vars and juror Stallman were entirely different from one another. Unlike Stallman's husband, Vars's husband, although present in the courtroom, had not expressed any particular views about the case or approached the defendants or their relatives and discussed the case with them. Mr. Stallman's actions in these respects, and his obvious interest in the merits of the case, gave the district court ample reason to infer that Mr. Stallman, someone who had no sworn duty and over whom the court had no control, would press his views upon his wife, regardless of any protestations she might have made. Furthermore, even if juror Stallman never discussed the case with her husband, she would inevitably have been distracted from her duty and less able to weigh the evidence independently once she understood through the district court's questioning that her husband held a certain view of the merits of the case. These circumstances amply justified the district court's exercise of discretion in removing juror Stallman. *See Agramonte,* 980 F.2d at 850; *Rodriguez,* 573 F.2d at 332–33.

■ As his final point on appeal, Purdy contends that the district court erred in its interpretation and application of section 2B4.1 of the Sentencing Guidelines and thus imposed an unlawfully high sentence. Under section 2B4.1 of the Guidelines, the base offense level for kickbacks and commercial bribery is eight, and the offense level is then adjusted upward, using the table in section 2F1.1, in accordance with the "value of the bribe or the improper benefit to be con-

ferred" (whichever is greater). U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2B4.1(b)(1) (1996). However, if the value of the benefit cannot be determined, the value of the bribe must be used. *See id.* § 2B4.1 Commentary Background.

As further commentary to the Guidelines suggests, the "benefit to be conferred" is normally calculated in such situations on the basis of the profits realized (or intended to be realized) on sales obtained by bribery. Lacking appropriate data to make this calculation, however, the district court instead calculated the "benefit to be conferred" by taking initial internal price estimates prepared for each of the twenty-two sales to Sikorsky and subtracting these amounts from the ultimate prices negotiated with Sikorsky—there being testimony that the bribes enabled Purdy Co. not only to obtain the contracts but also to inflate the price estimates submitted to Sikorsky. Applying this approach to all twenty-two purchase orders in evidence,[4] the court calculated the "improper benefit to be conferred" in this case as $1,176,155, yielding an elevenlevel increase in Purdy's offense level.

 The approach taken by the district court was fully supported by evidence introduced at trial and well within the court's discretion. While Purdy strenuously challenges the accuracy and reliability of the initial price estimates, these same challenges were raised at trial and the district court was in a position to assess their validity. We see no error, much less clear error, in the district court's findings. We note, moreover, that under section 2B4.1, the "improper benefit conferred" need not be determined with perfect accuracy. *See United States v. Hang*, 75 F.3d 1275, 1284 (8th Cir.1996); U.S.S.G. § 2B4.1 Commentary Background (noting that the amount may be "estimated").

In only one respect was the district court's approach logically flawed, but the error is harmless. Specifically, had the initial price estimates been submitted directly to Sikorsky without the antecedent bribes, they un-

doubtedly would have been negotiated downward (except in the case of two contracts that were obtained by competitive bidding), so that the difference between the putative untainted prices and the actual bribe-obtained prices would have been even greater than the district court determined. But since correction of this error could only have further disadvantaged the defendant, and the Government has not chosen to appeal the sentence, the error is harmless and the sentence is affirmed.

Accordingly, we affirm the district court's judgment in all respects.

---

4. Neither side disputes that, for purposes of sentencing, all 22 purchase orders embraced by the conspiracy should be considered, even if not all related directly to government prime contracts.

This is also fully consistent with the view we take of the broadening effect of the 1986 amendment to the Anti–Kickback Act.