United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 17, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-60490

UNITED STATES OF AMERICA,

Plaintiff - Appellee

versus

MACK ARTHUR BOWENS; WILLIE HAMPTON,

Defendants - Appellants

Appeals from the United States District Court for the
Northern District of Mississippi

( 2:00-CR-094-P-B )

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

After a two-week joint trial, a jury convicted Mack Arthur Bowens and Willie Hampton of various drug distribution and possession charges and Bowens alone of obstructing justice. The convictions resulted from sting operations conducted by the Tunica County Sheriff's Office, the Mississippi Bureau of Narcotics ("MBN"), and the Federal Bureau of Investigation. Defendants contend that their convictions are the result of a corrupt Tunica

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

County Sheriff, Lieutenant Jerome Hudson, whom Defendants contend launched a vendetta against Bowens and Hampton because Bowens exposed one of Lieutenant Hudson's friends as a corrupt FBI agent.

Defendants present nineteen claims of error. In Part I we explain the factual and procedural background relevant to both appeals. Part II addresses claims of error common to Bowens and Hampton. Part III addresses claims of error unique to Bowens. Part IV addresses claims of error unique to Hampton. Finally, Part V addresses Defendants' claim of cumulative error.

We find no reversible error in the convictions of Bowens and Hampton.

I

The story begins in 1999 with a sting operation of the Tunica County Sheriff's Office, the MBN, and the FBI. The sting used informants to make controlled buys of crack cocaine from Bowens and Hampton while under surveillance. Lieutenant Hudson of Tunica County, along with James Jones of the MBN and Special Agent Tom Bohlke of the FBI, recruited George Butler, who had previously been arrested for possession of crack cocaine, to make a controlled buy from Bowens. Government witnesses testified that on December 15, 1999, Butler went to a trailer occupied by Bowens and Jake Cotton, an associate of Bowens. Butler was given marked money and wore a wire. Lieutenant Hudson testified that Bowens' voice is heard on the audiotape telling Butler that his police source said Butler was

2

not a good customer. Bowens then said, "I can't go direct with you." Cotton and Butler then stepped outside the trailer, where Butler paid Cotton with the marked money. After circling the block at Cotton's request, Cotton gave Butler the crack cocaine. Butler returned to the agents and gave the drugs to them. Cotton was later arrested and testified at Bowens' trial that the crack cocaine belonged to Bowens and that Bowens told him to sell the drugs to Butler.

Butler made another controlled buy from Bowens and Cotton later that day. Bowens told Butler to see Cotton, who was at a different location. Butler drove to Cotton's location, and Cotton told Butler that he would go get the drugs from Bowens. At Cotton's request Butler circled the block and then bought crack from Cotton. Butler returned to the agents and gave the drugs to them.

In March 2000, Tunica police arrested Ruby Gooden on drug charges. She told Lieutenant Hudson that she would help him prosecute her drug sources if he helped her with her charges. Although no formal agreement was made, Gooden identified various sources of her drugs, including Bowens and Hampton, and stated that she often bought crack from them. On March 20, 2000, Gooden made a controlled buy of crack from Hampton at Hampton's sister's house. Lieutenant Hudson testified that the voice on the audiotape was Hampton's, that Hampton's car was at the house where the drug deal

3

occurred, and that Hampton's sister owned the house.

On March 29, 2000, Gooden made a controlled buy of crack from Bowens. She went to Bowens and Cotton's trailer, bought the crack cocaine, and returned to the agents. Bowens' car was outside the trailer at the time of the buy. She testified that Bowens laid the crack on a counter, she picked it up and replaced it with the buy money, and that he picked up the buy money. She told the agents that Bowens was in the trailer cutting a large amount of crack on a dinner plate.

Based on the above controlled buys, the agents sought and executed multiple search warrants. The first warrant issued for Hampton's sister's house, where Gooden and Butler made the controlled buys from Hampton. The search occurred a few hours after Gooden's March 20 buy. The agents found the marked buy money in Hampton's right front pocket. They also found 7 grams of crack cocaine, plastic bags, razors, scales, and a cutting agent in a bedroom containing Hampton's personal effects.

The agents next obtained a second search warrant for a garage owned by Hampton. The agents found a car inside the garage that Hampton had been seen driving in August 1999, and documents in the car showed Hampton as the owner. The agents found 7.5 pounds of cocaine inside the car, along with triple-beam scales, a bullet proof vest, wrapping material, and coffee grounds.

After Gooden's controlled buy from Bowens on March 29, 2000,

4

the agents obtained a search warrant for the trailer. As they approached the trailer, the agents saw Bowens leaving in his car. They pulled him over and found marked buy money in his pockets. Inside the trailer, the agents seized a dinner plate that tested positive for trace amounts of crack cocaine.

Bowens and Hampton were arrested in March 2000. Bowens was indicted on May 25, 2000, for (1) conspiracy to distribute and possess with intent to distribute in excess of 500 grams of cocaine (Count One); (2) distribution of crack cocaine, aided and abetted by Jack Cotton, at approximately 10:00 a.m. on December 15, 1999 (Count Two); (3) distribution of crack cocaine, aided and abetted by Jack Cotton, at approximately 3:00 p.m. on December 15, 1999 (Count Three); (4) distribution of crack cocaine on March 29, 2000 (Count Seven); (5) possession with intent to distribute in excess of 5 grams of crack cocaine (Count Eight); and (6) corruptly endeavoring to obstruct justice by causing a government witness to sign a false and fraudulent affidavit in an effort to undermine testimony (Count Nine). The government indicted Hampton of (1) conspiracy to distribute and possess with intent to distribute in excess of 500 grams of cocaine (Count One); (2) distribution in excess of 5 grams of crack cocaine on March 20, 2000 (Count Four); (3) possession with intent to distribute crack cocaine on March 20, 2000 (Count Five); (4) possession with intent to distribute in excess of 50 grams of crack cocaine and in excess of 500 grams of

5

cocaine hydrocholoride (Count Six).

Bowens and Hampton filed motions to sever their trials, to suppress evidence resulting from various search warrants, and for judgment of acquittal. They also asserted a claim of outrageous government conduct. The court denied the motions following a hearing and rejected the claim of outrageous government conduct.

At trial, Gooden's testimony focused on controlled buys and previous purchases from Bowens and Hampton. Her testimony was consistent with Lieutenant Hudson's regarding their details. She admitted that she was addicted to crack and that she had bought crack from Hampton and Bowens since 1996. She also discussed exculpatory documents that Bowens allegedly forced her to sign; she testified that she signed three documents stating that Lieutenant Hudson asked her to help him set up Bowens, but that the documents were not true. She signed them at the request of Bowens' girlfriend and other friends out of fear. During cross-examination, she refuted the allegation that she was asked to plant crack cocaine on both defendants. She stated that no one asked her to do so.

Butler corroborated Lieutenant Hudson's testimony about the two controlled buys from Bowens. He also testified that he bought crack from Bowens and Cotton on previous occasions from the same trailer. Finally, Butler testified that a week after the buys Bowens asked him to go for a ride with him, which he did.

6

According to Butler, Bowens drove him to the country, accused him of being a snitch and wearing a wire; that he pointed a handgun at him and said, "I'll kill you if you set me up."

Cotton testified that he pled guilty to aiding and abetting Bowens in distributing drugs and that the crack he sold Butler on December 15, 1999, and to Gooden on March 29, 2000, was Bowens' crack. He confirmed that Bowens was cutting crack in the trailer on March 29. He stated that Bowens sold a large amount of crack from the trailer in the past and that he was present when Bowens bought crack from Hampton for distribution. He testified that although he had signed an exculpatory document for Bowens, the document was false. Finally, he denied that he planted the crack on Bowens to aid the investigation.

The government's primary witness was Lieutenant Hudson, who recounted the events of the controlled buys and the searches. Although Bowens and Hampton challenged Lieutenant Hudson's testimony charging a vendetta resulting from Bowens' exposure of a corrupt FBI agent, several other agents corroborated Lieutenant Hudson's testimony.

First, James Jones of the MBN confirmed Lieutenant Hudson and Butler's story regarding Butler's controlled buys from Bowens. He also confirmed the testimony regarding Gooden's controlled buys from Hampton and Bowens. Jones was present during the Hampton search and confirmed that the buy money was recovered from Hampton

7

and that 7 grams of crack, scales, and other drug paraphernalia were found in a bedroom containing Hampton's belongings. He also confirmed that Gooden stated in debriefing after the buy that Bowens was in the trailer cutting crack on a dinner plate and that the search of Bowens and the trailer yielded a dinner plate with trace amounts of cocaine, the buy money, and $975 cash.

Second, FBI Agent Bohlke refuted the defendants' claims that the Tunica County Sheriff's Department seized Hampton's car in August 1999 and later planted it and the cocaine in the garage to be found during the search. Agent Bohlke testified that he was involved with the sting operation starting in December 1999 and that he had no knowledge of any drugs being planted.

Third, Fire Chief Koonce testified that he lived across the street from Hampton's garage and that he saw Hampton leaving the garage in his car at the end of November or the beginning of December. Koonce assisted the police in opening the garage to execute the warrant, and he testified that the garage had a strong chemical smell.

Finally, the government called various people who testified that they bought drugs from Bowens and Hampton in the past. Clarence Dorsey testified that he bought crack from Hampton at Hampton's sister's house on multiple occasions. Melvin Shipp testified that he was a previous drug dealer, that he bought crack from Hampton in the past, and that he sold drugs with Bowens in the

8

past. Bowens produced an exculpatory document that Shipp signed, but Shipp testified that the section of the document stating that Bowens had never dealt drugs was added after he signed it. Kevin Murphy testified that while in jail with Bowens, Bowens tried to get him to sign a document to affirm facts that he knew nothing about. Similarly, Danny Thomas testified that Bowens tried to get him to sign a document incriminating all the witnesses called by the government, but he refused to sign it because it was false. Thomas and another witness, Willie Wade, testified that they bought crack from Bowens in the trailer in the past. These witnesses corroborated details testified to by Lieutenant Hudson, Butler, and Gooden, including the unique shape of the crack sold by Hampton.

Bowens did not testify at trial. Hampton testified that he was in Memphis or had just left Memphis at the time of the alleged controlled buy. He also testified that his car was impounded by the police and remained in their possession when they searched the vehicle and found the drugs. In response, the government called Fernando Esco, who testified that, contrary to his testimony at trial, Hampton told him that the County returned his car to him.

Bowens and Hampton's primary argument below and on appeal hinges on the credibility of Lieutenant Hudson and the informants used by the agents. Appellants allege that Bowens previously exposed Special Agent Tatum, an FBI agent, as having forged his signature on a waiver of rights. Tatum was eventually convicted.

9

Bowens claims that because Tatum was a good friend of Lieutenant Hudson, Hudson framed him. The government claims that Lieutenant Hudson did not even know of Tatum's prosecution and resulting conviction until after completing the investigation of Bowens. Hampton does not explain why Lieutenant Hudson's vendetta against Bowens extends to him.

Defendants also sought to introduce evidence regarding Lieutenant Hudson's conduct while working at a different police department as evidence of his untruthful character and as evidence of opportunity to frame them. Lieutenant Hudson worked under Police Chief Ronnie White in the Greenwood, Mississippi Police Department. Chief White fired Lieutenant Hudson in 1996, nearly four years before he began the investigation of Bowens and Hampton in Tunica. Chief White would have testified that Lieutenant Hudson fraudulently attempted to cash a payroll check twice and that he failed to timely return funds provided for a controlled buy. After firing Lieutenant Hudson, Chief White found a large amount of illegal drugs in Lieutenant Hudson's police locker. Lieutenant Hudson's explanation was that he failed to timely check the drugs into the crime lab or to the station's evidence locker. No charges were ever brought against Lieutenant Hudson for his actions. Lieutenant Hudson testified that he was fired because he complained that the Police Chief was ignoring corrupt police conduct. The district court excluded Chief White's testimony.

10

After the two-week jury trial, the jury found Bowens and Hampton guilty of all charges except conspiracy. The court sentenced Bowens to 40 years of incarceration for Counts Two, Three, Seven, and Eight, and 10 years of incarceration for Count Nine, running concurrently. The court sentenced Hampton to life in prison without parole for Counts Four and Six, and 30 years of incarceration for Count Five, running concurrently.

Defendants moved for a new trial based on evidence discovered after trial showing that Lieutenant Hudson improperly held Gooden in jail during the investigation and throughout the trial. Defendants contend that Lieutenant Hudson did so in order to coerce her testimony. They claim that Lieutenant Hudson altered an arrest warrant to indicate that Gooden was still under arrest during trial when the charge had in fact been dismissed. They also contend that Lieutenant Hudson sent a letter to the Tunica Sheriff's Department explaining Gooden was in the Federal Witness Protection Program and was not to be visited by anyone, when in fact she was in the Federal Emergency Witness Assistance Program. The court denied the motion without a hearing.

## II

Bowens and Hampton raise several common claims of error. They claim (1) that the district court abused its discretion by excluding evidence that could establish Lieutenant Hudson's motive to frame them; (2) that the government committed *Brady* violations

11

by suppressing material, favorable evidence; and (3) that the district court abused its discretion by denying their motion to sever the joint prosecution.

A

Bowens and Hampton claim that many of the court's evidentiary rulings constitute an abuse of its discretion. Specifically, they contend that the court erred in (1) finding that evidence regarding Lieutenant Hudson's possible bias was irrelevant and unfairly prejudicial; (2) limiting their cross-examination of Lieutenant Hudson; and (3) excluding testimony of Chief White, Lieutenant Hudson's former boss. Although the court allowed Defendants to present evidence and argue that Lieutenant Hudson planted drugs at issue, Defendants assert that the Tatum evidence and testimony of Chief White were essential to explain why Lieutenant Hudson may have framed them.

We review a district court's evidentiary rulings for an abuse of discretion.[1] "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found."[2] Even if the court abused its discretion, reversal is required only if the evidentiary error affected the substantial

---

[1] *United States v. Powers*, 168 F.3d 741, 748 (5th Cir. 1999).

[2] *Dawson v. United States*, 68 F.3d 886, 896 (5th Cir. 1995) (quoting *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995)).

12

rights of the parties.[3]  "An error is harmless if the court is certain, after reviewing the record, that the error did not influence the jury or had only a slight effect on its verdict."[4]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[5]  Otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[6]  The trial judge has broad discretion over determinations of relevance and unfair prejudice.[7]  But Rule 403 should be used sparingly to exclude relevant evidence.[8]

1

The district court granted the government's motion in limine excluding all evidence regarding Agent Tatum as irrelevant, unfairly prejudicial, and confusing.  Defendants argue that the court's exclusion was an abuse of discretion because it effectively

---

[3] FED. R. EVID. 103(a).

[4] *Tanner v. Westbrook*, 174 F.3d 542, 549 (5th Cir. 1999) (citing *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1094 (5th Cir. 1994)).

[5] FED. R. EVID. 401.

[6] FED. R. EVID. 403.

[7] *United States v. Madera*, 574 F.2d 1320, 1322 (5th Cir. 1978).

[8] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

13

denied them their Sixth Amendment right to present a vigorous defense.

Although an accused has a Sixth Amendment right to offer testimony and to question witnesses, the right to a vigorous defense is limited by the Federal Rules of Evidence.[9] Due process and the Sixth Amendment's Compulsory Process Clauses entitle a defendant to obtain witnesses in his favor and present exculpatory evidence, but a defendant's rights are abridged only when the defendant is precluded from presenting testimony or witnesses that are relevant and material to the defense.[10] Accordingly, although Appellants phrase their argument in terms of the Sixth Amendment, the question is whether the court abused its discretion by excluding evidence as irrelevant and unfairly prejudicial.

The government claims that Lieutenant Hudson had no knowledge of the Tatum investigation or its outcome until after the investigation of Bowens had begun. As a result, the proposed evidence would only show that an FBI agent unrelated to the Bowens investigation committed a felony in an unrelated case. Moreover,

---

[9] *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) ("The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.").

[10] *See Washington v. Texas*, 388 U.S. 14, 23 (1967); *see also Taylor*, 484 U.S. at 408.

14

the government notes that if the Tatum evidence had been admitted, the government in turn would have admitted evidence that Bowens put a bounty on Lieutenant Hudson's life and that this was the reason the investigation began, not because of any vendetta.  Introduction of this evidence, the government urges, would prejudice the defendants, confuse the jury, and unnecessarily consume time.

The court erred by excluding the evidence as irrelevant.  FED. R. EVID. 401 requires only that evidence be probative of the proposition it is offered to prove and that the proposition be of consequence to the case as determined by the substantive law.[11] Appellants' theory was that Lieutenant Hudson planted the drugs as revenge for Bowens' exposure of Lieutenant Hudson's friend. Evidence of Lieutenant Hudson's friendship with Tatum and of Bowens' fear of being set up, as evidenced by letters written by Bowens predating his arrest, is probative of Lieutenant Hudson's bias, and is of consequence to the determination of whether Bowens did in fact possess and distribute crack cocaine.  Given that evidence of a witness's bias, especially one like Lieutenant Hudson who served as the government's chief witness and who was a leader of the investigation against the defendants, is usually relevant, the court abused its discretion in finding this evidence to be

---

[11] *See United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. Unit A Aug. 1981).

irrelevant.[12]

The government claims that the evidence's probative value is substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, and undue delay because the government would have been forced to counter, as an alternative reason why the investigation began, with evidence of Bowens placing a bounty on Lieutenant Hudson's life. However, Bowens was willing to risk any resulting prejudice from the government's rebuttal evidence, and a court should not exclude evidence out of concerns for delay when the evidence is important in resolving the case.[13]

However, a review of the record reveals that any error was harmless. The government presented strong corroborating testimony and evidence of guilt. Two agents from separate departments - the MBN and the FBI - corroborated Lieutenant Hudson's story, and they

---

[12] *See United States v. Abel*, 469 U.S. 45, 51 (1984) (holding that evidence of a witness's bias was admissible because "[a] successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony"); *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.") (internal quotation marks omitted).

[13] *See, e.g., Busby v Orlando*, 931 F.2d 764, 785–86 (11th Cir. 1991). Moreover, Rule 403 should be used sparingly to exclude relevant evidence; the danger of unfair prejudice must substantially outweigh the probative value of the evidence. Considering that the Tatum evidence would call the credibility of the government's main witness into question and that it served as the only evidence of Lieutenant Hudson's bias, its probative value is high. The exclusion is not justified as precluding unfairly prejudicial or confusing evidence.

16

specifically denied that drugs or buy money were planted. Defendants focus on Lieutenant Hudson's alleged control of Gooden, but both Gooden and Butler testified that they bought crack from Bowens, further corroborating Lieutenant Hudson's story. Finally, various other witnesses testified to their purchases of crack from Defendants and that Bowens either attempted to coerce or succeeded in coercing false affidavits from many of the witnesses. Defendants were found with the buy money after the controlled buys occurred, and the authorities found evidence of cocaine in Hampton's bedroom, Hampton's car, and in Bowens' trailer. Given this overwhelming evidence of guilt, any error by the court in excluding evidence of Lieutenant Hudson's bias could not have affected the jury's determination. Any error was harmless and does not justify reversal.

2

Defendants also contend that the court erred in not allowing cross-examination regarding Lieutenant Hudson's possible bias, again relying on the Sixth Amendment. We agree that the court erred in limiting cross-examination, but the error was harmless for the reasons described above.[14] The material facts and allegations were corroborated by other government witnesses that are not subject to Defendants' allegations of bias. The error, at most, could have only a slight effect on the jury's verdict and is

---

[14] *Van Arsdall*, 475 U.S. at 682.

17

therefore harmless.[15]

3

Appellants sought to admit Chief White's testimony that in 1996, four years before the investigation of Bowens, Chief White found a significant amount of illegal drugs in Lieutenant Hudson's police locker. They sought to admit this testimony as proof of Lieutenant Hudson's opportunity to frame Bowens under Rule 404(b), or as a specific instance of conduct probative of untruthfulness under Rule 608(b).

During trial, the parties agreed to three stipulations: (1) that Chief White dismissed Lieutenant Hudson for his fraudulent attempt to cash his paycheck twice; (2) that Chief White found a large amount of unaccounted for illegal drugs in Lieutenant Hudson's police locker that should have been checked into the evidence vault; and (3) that Lieutenant Hudson failed to timely return buy money. The court, however, rejected the latter two stipulations as inadmissible under Rules 404(b) and 608(b) of the Federal Rules of Evidence. Specifically, the court found that the drug locker evidence was not probative of Lieutenant Hudson's character for untruthfulness to qualify under Rule 608(b) and that it was not admissible as evidence of opportunity under Rule 404(b) because the incident occurred years before at a time when Lieutenant Hudson did not know the defendants.

---

[15] *See Tanner*, 174 F.3d at 548-49.

18

The court did not err by excluding Chief White's testimony under Rule 608(b).[16] Rule 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, ... may not be proved by extrinsic evidence," but, at the discretion of the court, a party may inquire about specific instances during cross-examination "if probative of truthfulness or untruthfulness."[17] This language makes clear that specific acts going to a witness's truthfulness may be investigated at the court's discretion during cross-examination; the rule does not allow attacking a witness's credibility through extrinsic evidence.[18] Defendants do not explain why the plain language of Rule 608(b) does not control.

Nor was the evidence erroneously excluded as evidence of Lieutenant Hudson's opportunity to frame the defendants. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may "be admissible for other purposes, such as ... opportunity."[19] A court has broad

---

[16] *Id*. This determination also disposes of Bowens' contention that the court erred by finding that the "drug locker evidence" and Bowens' failure to timely return the buy money were not probative of Bowens' character for truthfulness.

[17] FED. R. EVID. 608(b).

[18] *United States v. White*, 972 F.2d 590, 600 (5th Cir. 1992).

[19] FED. R. EVID. 404(b); *see also United States v. Beechum*, 582 F.2d 898, 910-11 (5th Cir. 1978).

19

discretion in determining admissibility under Rule 404(b).[20] Evidence of opportunity under Rule 404(b) must be independently relevant by fitting into a logical chain of inferences and bearing a "reasonable relationship to the issues at trial."[21] It is the proponent's burden to demonstrate the proposed evidence's relevance, and it is error to admit evidence that bears no reasonable relationship to the issues presented at trial.[22] The Second Circuit held that a trial court erred by admitting evidence of an accused's drug conviction that occurred twelve years before the acts at issue as rebuttal evidence of the accused's defense that he was only a bystander.[23] In contrast, we held in *United States v. Coleman* that videotaped statements of the defendant regarding actions occurring earlier in the same day were properly admissible as evidence of the defendant's opportunity to commit the

---

[20] *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977).

[21] CHARLES E. WAGNER, FEDERAL RULES OF EVIDENCE CASE LAW COMMENTARY 404-35 to 404-36 (2002) (citing *United States v. Sampson*, 980 F.2d 883, 888 (3d. Cir. 1992); *see also United States v. Cortinas*, 142 F.3d 242, 247 (5th Cir. 1998) (noting that the first inquiry in determining admissibility under Rule 404(b) is whether the evidence is relevant to an issue other than character).

[22] CHARLES E. WAGNER, FEDERAL RULES OF EVIDENCE CASE LAW COMMENTARY 404-35 to 404-36 (2002) (collecting cases).

[23] *United States v. Garcia*, 291 F.3d 127, 137-38 (2d. Cir. 2002) ("If the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent. . . . Without a connection between the two acts, the prior act is not relevant or probative and is inadmissible.").

20

crimes charged.[24]

Bowens relies on *United States v. McClure*[25] to support his argument that this evidence was admissible as evidence of opportunity, but *McClure* is inapposite. In *McClure*, the defendant was convicted of distribution of illegal drugs, and he urged on appeal that the court erred in excluding proffered testimony of three witnesses. These witnesses would have testified that the same government informant who posed as the buyer from McClure later intimidated them into selling drugs.[26] McClure sought to introduce this testimony, which was evidence of "other wrongs" of the government informant, as proving McClure's lack of criminal intent in selling the drugs under Rule 404(b). The district court excluded the testimony as not probative of McClure's criminal intent because the alleged events occurred after McClure's sale to the informant. We reversed the district court, holding that "under Fed. R. Evid. 404(b) evidence of a systematic campaign of threats and intimidation against other persons is admissible to show lack of criminal intent by a defendant who claims to have been illegally

---

[24] 78 F.3d 154, 156-157 (5th Cir. 1996) (holding that the defendant's statement regarding efforts to carjack other victims earlier in the day "was particularly helpful in evaluating Coleman's opportunity to use the weapon and his knowledge of Beasley's intent to use a weapon to carjack an automobile, and in generally placing Coleman's conduct regarding the charged offenses in proper context").

[25] 546 F.2d 670 (5th Cir. 1977).

[26] *Id*. at 672.

coerced."[27]   However, *McClure* does not address when evidence is properly admissible as proof of opportunity under Rule 404(b).  As such, Bowens is mistaken in relying on it to mitigate the fact that the proof of Lieutenant Hudson's alleged opportunity occurred four years before the investigation of Bowens began.[28]

Bowens provides no authority supporting his assertion that evidence of a police officer's personal possession of narcotics four years before an investigation began is properly admissible under Rule 404(b) as evidence of opportunity.  The court below and the government on appeal properly assert that the drug locker evidence is simply too remote and unrelated to constitute evidence of Lieutenant Hudson's opportunity to frame Bowens.

Defendants' only response is that neither Rule 404(b) nor Rule 608(b) require the specific act to be closely related in time to the charged crime and that, in any case, he is not asserting that Bowens used the drugs from the Greenwood Police Department to set up Bowens.  Rather, they assert that because Lieutenant Hudson had access to drugs previously, he could have had access again,

---

[27] *Id*. at 672-73.

[28] Bowens also cites *United States v. Blum*, 62 F.3d 63 (2d Cir. 1995), but it is similarly inapposite.  In *Blum*, the Second Circuit held that the district court erred in excluding testimony as extrinsic character evidence of a witness because the testimony was proper evidence of motive under Rule 404(b).  *Id*. at 68.  The question here is whether evidence of Lieutenant Hudson's possession of seized drugs in 1996 is properly admissible as proof of opportunity during the investigation of Bowens four years later.

22

providing the opportunity to frame Bowens. This argument is unpersuasive because any narcotics officer involved in a sting operation has access to narcotics seized and later placed in the evidence locker. Bowens does not explain how Lieutenant Hudson's actions in 1996 could produce an opportunity to frame Bowens in 2000. Rule 404(b) prohibits the use of character evidence to prove conforming conduct, but Chief White's testimony would have provided just that: evidence of Lieutenant Hudson's past conduct to insinuate that he did the same thing again while a member of the Tunica County Sheriff's Department. Bowens has not shown a valid exception under Rule 404(b).[29]

The court did not abuse its discretion in excluding the testimony of Chief White.[30]

B

After trial, Defendants moved for a new trial based on alleged *Brady* violations. First, Defendants alleged that the government

---

[29] Bowens was free to cross-examine Lieutenant Hudson about his actions while employed in Greenwood. Rule 404(b) and 608(b) would not have been a bar to delving into Lieutenant Hudson's work history on cross-examination. Bowens chose instead to introduce the evidence through Chief White, making it extrinsic character evidence subject to Rules 608(b) and 404(b).

[30] Defendants also assert that excluding Chief White's testimony violated their Sixth Amendment right to compulsory process for witnesses. As discussed above, a defendant's Sixth Amendment rights are not unbound. *Van Arsdall*, 475 U.S. at 679. Because the district court properly excluded Chief White's testimony under the Federal Rules of Evidence, there was no Sixth Amendment violation.

23

suppressed an MBN policy providing that "drug addicts shall not be used as informants without the written approval of the Director." Appellants contend that they could have used this policy to impeach the informants. Second, Defendants allege the suppression of documents regarding Gooden's arrest and incarceration, including public records and a memorandum written by Lieutenant Hudson to the jail administrator stating that Gooden was in a "federal witness program." Appellants assert, without any answer by the government, that Gooden was held against her will by Lieutenant Hudson.[31] The court found no *Brady* violation.[32]

1

We review *Brady* determinations de novo.[33] To establish a *Brady* violation, a defendant must show that the government suppressed

---

[31] Counsel for Bowens indicated at oral argument that Gooden brought suit to recover for Lieutenant Hudson's actions and has settled her claim.

[32] Hampton asserts that the court erred in resolving the motion without conducting an evidentiary hearing. This argument is without merit. District courts may resolve motions for new trial without conducting an evidentiary hearing. *See United States v. Runyan*, 290 F.3d 223, 248 (5th Cir. 2002) (explaining that "the decision to hold a hearing rests within the sound discretion of the trial court") (internal quotation marks omitted). The district court handled this case during pretrial, through a two-week jury trial, and through sentencing; it could fully consider the nature and effect of the documents alleged to be improperly suppressed in light of its knowledge of all the players involved. We find no abuse of discretion.

[33] *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).

24

favorable, material evidence.[34] Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[35] "The materiality of *Brady* evidence depends almost entirely on the value of the evidence relative to the other evidence mustered by the State."[36] Thus, "when the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs."[37]

2

The MBN policy limiting the use of drug addicts as informants was not suppressed by the government. Defendants make a general claim that they did not know of the policy during trial, but they do not explain why the policy was not discoverable through the exercise of due diligence. Their knowledge of the policy before trial is evidenced by Hampton's attempt to get a copy of the policy from the U.S. Attorney's office. The U.S. Attorney could not furnish a copy of the policy because it was a policy of the Mississippi Bureau of Narcotics, but Hampton was informed that the policy was obtainable from the MBN. A post-trial letter written to

---

[34] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[35] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[36] *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992).

[37] *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

the MBN from defendants demonstrates that the policy was obtainable from the MBN within a matter of days. Given that the government bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence,[38] there was no *Brady* violation based on the U.S. Attorney's failure to provide the MBN policy.

Similarly, Defendants fail to explain why the public records and documents indicating Gooden's improper detention were not obtainable through due diligence or were not cumulative. All of the documents and evidence discussed in Bowens' opening brief were disclosed, and therefore cannot constitute a *Brady* violation. Bowens knew that (1) Gooden was arrested in March 2000 and that the charges were later dismissed because of her cooperation; (2) Gooden entered the Federal Emergency Witness Assistance Program, which included drug rehabilitation; (3) Gooden exited the program because she did not wish to stay in the rehabilitation program; (4) Gooden was subsequently re-arrested by Lieutenant Hudson; and (5) Lieutenant Hudson justified Gooden's arrest by scratching out the date on her original March 2000 arrest warrant and replacing it with "November 2000." Bowens had a copy of the original arrest warrant and the altered version, and he knew that Gooden remained incarcerated. Given that the state bears no responsibility to

---

[38] *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir. 1997).

26

direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence, the evidence at issue was not suppressed in violation of *Brady*.[39]

In his reply brief, Bowens focuses solely on three categories of evidence: the affidavits of Gooden claiming she was improperly held against her will to coerce her testimony, affidavits from other jail officials stating that Lieutenant Hudson told them that Gooden was in the Federal Witness Protection Program despite the fact that she was only in the Federal Emergency Witness Assistance Program, and the jailer's letter inquiring about the status of Gooden's detention. But these documents do not establish a *Brady* violation. The affidavits were taken after trial and therefore could not have been suppressed. The letter was cumulative and therefore immaterial, despite Defendants' claim that they needed the jailer's letter "to put the pieces of the puzzle together." The withheld evidence is cumulative of what Defendants already knew or could have discovered through reasonable diligence – that Lieutenant Hudson was holding Gooden based on questionable authority.[40]

The alleged conduct of Lieutenant Hudson is disturbing, and Gooden brought suit to address the alleged false imprisonment. But

---

[39] *Id*.

[40] *Spence*, 80 F.3d at 995.

27

the record does not indicate that a *Brady* violation occurred.[41]

                                    C

Bowens and Hampton were indicted together. Bowens moved for relief from prejudicial joinder under FED. R. CRIM. P. 14, which provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[42] The district court denied the motion.

---

[41] Defendants also claim that the evidence of Gooden's allegedly illegal detention entitles them to a new trial based on newly discovered evidence. Other than the evidence discussed above, which was either not suppressed or immaterial, the only new evidence on which Defendants base their claim is Gooden's post-trial affidavits. Gooden has now recanted her in-court testimony that she voluntarily participated with the government, and now claims that Lieutenant Hudson illegally held her and threatened to take her children away if she did not assist him in prosecuting Bowens and Hampton. The district court noted the "so-called affidavits" in its Memorandum Opinion, but it found that "based on Gooden's testimony at the hearing on the motion to suppress, the Court is convinced that she voluntarily assisted the department in obtaining information about Hampton and Bowens."

Although her new testimony, if true, would cast doubt on the trial, Bowens concedes in his brief that, considering Gooden's character and her ever-changing stories, "the recantation by Gooden should be viewed with extreme caution." He concedes that only when coupled with the newly discovered evidence of Lieutenant Hudson's illegal holding of Gooden, could her recantation provide a basis for a new trial. Given that there is no material, non-cumulative, newly-discovered evidence of Lieutenant Hudson's actions, Gooden's affidavits are insufficient to warrant a new trial. *See United States v. Pena*, 949 F.2d 751, 758-59 (5th Cir. 1991); *see also United States v. Jaramillo*, 42 F.3d 920, 924 (5th Cir. 1995).

[42] FED. R. CRIM. P. 14(a).

28

On appeal, Bowens asserts that he was prejudiced by being tried alongside Hampton, who distributed a significantly larger amount of cocaine, and who Bowens asserts had a much weaker case.[43] The government notes the district court's broad discretion in determining motions to sever and asserts that there was no abuse of discretion.

We review the court's denial of Bowens' motion to sever for an abuse of discretion.[44] FED. R. CRIM. P. 8(b) provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction ... constituting an offense or offenses."[45] It is rote that as a general matter, "persons indicted together should be tried together, especially in conspiracy cases."[46] "To demonstrate that a district court abused its discretion in denying a motion to sever, the defendant must show that: (1) the joint trial prejudiced

---

[43] Hampton attempts to join this argument under FED. R. APP. P. 28(i). He does not, however, specify why he was prejudiced as a result of the joint trial. Bowens' assertion of prejudice as a result of being tried with Hampton is fact-specific to Bowens' position; therefore, Hampton may not join in Bowens' claim of error. *See United States v. Baptiste*, 264 F.3d 578, 586 n.6 (5th Cir. 2001).

[44] *United States v. Richards*, 204 F.3d 177, 193 (5th Cir. 2000), *overruled on other grounds by United States v. Longoria*, 298 F.3d 367, 372 & n.6 (5th Cir. 2002).

[45] FED. R. CRIM. P. 8(b).

[46] *United States v. Posada-Rios*, 158 F.3d 832, 863 (5th Cir. 1998) (internal quotation marks omitted).

29

him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration."[47] The prejudice must be "specific and compelling."[48] "[A]n appellant must isolate events occurring in the course of the joint trial and then . . . demonstrate that such events caused substantial prejudice."[49] In determining whether the defendant is prejudiced, the jury's resolution of the various charges is instructive: "acquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately."[50] Similarly, cautionary instructions given by the court to the jury decrease the possibility of prejudice. Finally, denying a motion to sever despite a quantitative disparity of evidence and a possible spillover effect does not necessarily equal an abuse of discretion.[51]

Bowens contends that he, as a defendant with a stronger case than Hampton, was severely prejudiced by being tried with Hampton, who Bowens characterizes as a major drug dealer. However, it is

---

[47] *Richards*, 204 F.3d at 193 (internal quotation marks omitted).

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994).

well-established that even assuming a quantitative disparity of evidence between Hampton and Bowens, the resulting possibility of prejudice does not entitle Bowens to a severance and a finding on appeal that the district court abused its discretion.[52] The court instructed the jury that each count constituted a separate crime, that the evidence pertaining to each count should be considered separately, and that a determination on one count "should not control your verdict as to any other." Similar instructions have been found to eliminate the possibility of prejudice.[53] Furthermore, the jury acquitted as to the conspiracy count but convicted on other counts, cutting against Bowens' claim of error.[54] Other than his general "spillover" assertion, Bowens points to no compelling or specific prejudice that would justify a finding that the court abused its discretion. With the same awareness mentioned in *United States v. Simmons*,[55] we find no reversible error in the court's decision to deny the motion to sever.

---

[52] *See id.*

[53] *Richards*, 204 F.3d at 193; *Posada-Rios*, 158 F.3d at 864; *United States v. Faulkner*, 17 F.3d 745, 759 (5th Cir. 1994).

[54] *See Richards*, 204 F.3d at 193.

[55] 374 F.3d 313, 318 (5th Cir. 2004) ("In our decision we are keenly aware that the claimed 'efficiency' of a joint trial can be a surrogate for the reality that a joint trial of multiple defendants is simply to the advantage of the government. It is the potential presence of prosecutorial advantage distinct from the expense of duplicating efforts that draws our attention.").

31

Bowens raises three claims of error unique to his appeal: (1) that the evidence is insufficient to support his convictions; (2) that the court erred by denying his motion to suppress evidence; and (3) that the court clearly erred in determining his sentence. We find no reversible error.

A

Bowens' sufficiency of the evidence argument boils down to a claim that no reasonable jury could convict him based primarily on the testimony of government informants who benefitted from their testimony and whose credibility was questionable because of their drug addictions. This claim of error fails, however, because (1) credibility determinations are for the jury; (2) the law provides that a defendant may be convicted on the uncorroborated testimony of a co-conspirator who benefits from his testimony so long as the testimony is not incredible; and (3) in any case, the government introduced a significant amount of other direct and circumstantial evidence supporting the convictions. As a result, Bowens cannot meet the difficult standard of review, showing that no reasonable jury could have found him guilty beyond a reasonable doubt.

1

"In reviewing an appeal based on insufficient evidence, the standard is whether any reasonable trier of fact could have found that the evidence established the defendant's guilt beyond a

reasonable doubt."[56]  We review the evidence in the light most favorable to the verdict.[57]  Given that "the jury retains the sole responsibility for determining the weight and credibility of the evidence,"[58] we do not ask "whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."[59]  Finally, it is clear that "a defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible."[60]  Testimony that relates facts impossible for the witness to observe is incredible.[61]

2

The government charged Bowens with two counts of distributing crack cocaine, as aided and abetted by Cotton, to Butler (Counts Two and Three), one count of distributing crack cocaine to Gooden (Count Seven), one count of possessing with intent to distribute crack cocaine (Count Eight), and one count of obstruction of justice (Count Nine).  The drug charges are violations of 21 U.S.C.

---

[56] *Jaramillo*, 42 F.3d at 922-23.

[57] *Id*. at 923.

[58] *Id*. at 922.

[59] *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

[60] *United States v. Villegas-Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999).

[61] *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994).

§ 841(a), providing that it "shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[62] The essential elements are knowledge, possession or distribution of a controlled substance, and intent.[63] Possession can be actual or constructive, which "has been defined as ownership, dominion or control over the contraband, or over the vehicle in which the contraband was concealed."[64]

Regarding Counts Two and Three, the government presented evidence through the testimony of Lieutenant Hudson, James Jones of the MBN, Butler, Cotton, and other witnesses providing circumstantial evidence, that (1) the Tunica County Sheriff's Office, along with agents from the MBN and the FBI, set up a sting operation involving Butler, who was under arrest for drug violations; (2) the agents searched Butler's car and person before giving him marked buy money and following him to the trailer where Bowens and Cotton were located; (3) the agents conducted surveillance of Butler's conversation with Bowens and Cotton; (4) Bowens told Butler that he could not deal with Butler directly because Bowens' police informant said that Butler was bad business;

---

[62] 21 U.S.C. § 841(a)(1).

[63] *United States v. Solis*, 299 F.3d 420, 447 (5th Cir. 2002).

[64] *United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996).

(5) Cotton sold crack to Butler outside of the trailer;[65] (6) the crack Cotton sold to Butler was given to Cotton by Bowens; (7) Bowens often sold crack from the trailer, which he bought from Hampton; (8) Clarence Dorsey, a former drug dealer, sold .5 ounce quantities of cocaine to Bowens on a regular basis; (9) Danny Thomas bought crack from Bowens in the trailer in 1999; (10) Willie Wade bought crack from Bowens; (11) a later search of the trailer where Bowens allegedly sold crack revealed trace amounts of cocaine on a plate, confirming Gooden's allegations; and (12) Bowens either succeeded in persuading, or attempted to persuade, five people to sign documents stating that he had never sold drugs to anyone.

This accumulation of testimony, coupled with the circumstantial evidence of Bowens' sales of crack to Butler, provides sufficient evidence to support Counts One and Two. The jury heard Bowens' cross-examination of the witnesses, including Cotton, and they heard Bowens' argument that Cotton, not Bowens, should be responsible for the sales to Butler. Although a co-conspirator who has reached a plea agreement is less credible than an unbiased witness, it is well-settled that "[a] defendant may be convicted on the uncorroborated testimony of a co-conspirator who has accepted a plea bargain."[66] The only limitation is that the testimony must not be incredible, but considering that Cotton was

---

[65] Cotton was not under arrest and a police informant at this time.

[66] *Villegas-Rodriguez*, 171 F.3d at 228.

35

in a position to confirm Bowens' actions, his testimony was not incredible. Credibility determinations are for the jury.[67] A rational jury could convict Bowens of the sales to Butler.

Counts Seven and Eight involve one sale of crack to Gooden and Bowens' possession with intent to distribute in excess of 5 grams of cocaine base on March 29, 2000. Through the testimony of Lieutenant Hudson, James Jones of the MBN, Gooden, and other witnesses providing circumstantial evidence, the government presented evidence that (1) the Tunica County Sheriff's Office, along with agents from the MBN and the FBI, set up a sting operation involving Gooden, who was under arrest for drug violations; (2) the agents searched Gooden's car and person before giving her marked buy money and following her to the trailer where Bowens was located; (3) the agents conducted surveillance of Gooden's conversation with Cotton and Bowens; (4) Bowens placed five rocks of crack on a table, Gooden laid the buy money on the table, Bowens picked the money up, and the crack sold belonged to Bowens; (5) Gooden told agents after the buy that Bowens was inside the trailer and had been cutting a large amount of crack on a dinner plate; (6) Bowens' car was at the trailer during the controlled buy; (7) a warranted search revealed a dinner plate that tested positive for crack cocaine; (8) a search of Bowens revealed

---

[67] *United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995).

36

$975 dollars, including the $100 of buy money in his front pocket; (9) Bowens forced Gooden to sign exculpatory documents saying that he was not a drug dealer; and (10) various other people purchased crack from Bowens in the trailer and were forced or asked to sign exculpatory documents for Bowens.

Bowens has not demonstrated that the evidence was insufficient. Bowens' attorney cross-examined each of these witnesses and exposed their inconsistencies. Again, credibility determinations are for the jury, and when coupled with other evidence of Bowens' involvement in drug trafficking, a rational jury could convict him of possession with intent to distribute and of the sale to Gooden.

Turning to Count Eight, obstruction of the due administration of justice, in violation of 18 U.S.C. § 1503(a), the government was required to prove "(1) that a judicial proceeding was pending; (2) that the defendant had knowledge of the judicial proceeding; and (3) that the defendant acted corruptly with the specific intent to influence, obstruct, or impede that proceeding in its due administration of justice."[68]

The government presented evidence that while drug charges were pending in federal court against Bowens, he coerced Cotton into signing a false affidavit exonerating Bowens of all drug activity.

---

[68] *United States v. De La Rosa*, 171 F.3d 215, 220-21 (5th Cir. 1999).

There is no dispute that at the time of the alleged event, April 2000, charges were pending and that Bowens knew of the judicial proceeding. Cotton testified that Bowens coerced him into signing the affidavit, which Bowens knew was false.

Bowens asserts that nothing was corrupt about his actions; he was merely preparing his defense to the drug charges. He also contends that Cotton's testimony cannot be trusted because of his character and prior inconsistencies.

Bowens' argument is without merit. First, he cites no authority for his contention that Bowens' actions could not be corrupt because there is no evidence of force or threats. The statute itself speaks in disjunctive terms, making it unlawful for anyone to "corruptly *or* by threats or force, *or* by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice."[69] The term "corruptly," as used in § 1503, means "for an improper motive" or "an evil or wicked purpose."[70] There is no statutory requirement that force or threats of force be used. Second, Bowens' attack on Cotton's credibility fails for the reasons discussed above: Cotton was subject to cross-examination, and it is the jury's job to judge credibility. Finally, Cotton's testimony is not wholly incredible. The jury

---

[69] 18 U.S.C. § 1503(a) (emphasis added).

[70] *United States v. Haas*, 583 F.2d 216, 220 (5th Cir. 1978).

found Cotton's testimony to be credible, and it provided sufficient evidence on which a rational jury could convict Bowens of obstruction of justice. The evidence supports Bowens' conviction on Count Eight.

B

Before trial, Bowens moved to suppress evidence resulting from two warranted searches that he asserts were invalid. Bowens contends that the government agents knowingly or recklessly misled the issuing judge by failing to disclose that the confidential informant on which they relied (Gooden) was addicted to crack, under arrest, and assisting the government in exchange for leniency. He contends that if the Magistrate Judge had known that Gooden was the government's source, the warrants would not have issued.[71]

In response, the government asserts that the agents did not falsify affidavits or intentionally mislead the judges who issued the search warrants. The affidavits represented that their confidential informant was reliable based on the controlled buys that corroborated her initial allegations that she could obtain crack from Bowens and Hampton. The agents set up the sting operation, recounted the details to the judge, and informed the judge that the informant succeeded in buying crack. The agents

_____

[71] The first warrant issued to search the trailer where Bowens and Cotton allegedly sold crack, and the second warrant issued to search Bowens' residence.

39

informed the judge that the controlled buys were recorded, but they did not disclose that their source was a drug addict, that Bowens' voice could not be heard on the audiotape, and that no agent actually witnessed the sale occur.

After a two-day suppression hearing, the district court found that although the issuing judges were not told of Gooden's drug use or arrest, "no one intentionally misrepresented important facts to either judge."  Further, the court found that based on the affidavits for the search warrants, the search warrants were valid because "the judges had a 'substantial basis for ... conclud[ing]' probable cause existed."

1

In reviewing a denial of a motion to suppress, the court's factual findings are reviewed for clear error, while the court's legal conclusions are reviewed de novo.[72]  "Our review of a district court's denial of a motion to suppress evidence seized pursuant to a warrant is limited to (1) whether the good-faith exception to the exclusionary rule applies, and (2) whether the warrant was supported by probable cause."[73]

The good-faith exception provides that "[e]vidence obtained by officers in objectively reasonable good faith reliance upon a

---

[72] *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (per curiam).

[73] *United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996).

search warrant is admissible, even though the affidavit on which the warrant was based was insufficient to establish probable cause."[74]  An officer's reliance is in good faith "so long as the warrant is supported by more than a 'bare bones affidavit.'"[75]  A bare bones affidavit "is so deficient in demonstrating probable cause that it renders an officer's belief in [the existence of probable cause] completely unreasonable."[76]  However, an officer will not have reasonable grounds for believing the warrant issued properly "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."[77]

2

Even assuming the lack of probable cause, the good-faith exception supports the court's denial of the motions to suppress. The fact that information provided by an informant is against her own penal interest provides "substantial corroboration."[78]  Here,

---

[74] *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997) (internal brackets and quotation marks omitted).

[75] *Id.* (internal quotation marks omitted)*; see United States v. Leon*, 468 U.S. 897, 920 (1984).

[76] *Cisneros*, 112 F.3d at 1278.

[77] *Leon*, 468 U.S. at 923.

[78] *See United States v. McKeever*, 5 F.3d 863, 865 (5th Cir. 1993) (citing *United States v. Harris*, 403 U.S. 573, 583–84 (1971)).

Gooden informed the agents that her sources for crack were Bowens and Hampton and that she had purchased crack from them on various occasions. These statements were against her penal interest and provide substantial corroboration.

Yet the affidavits did not rely on her statements alone. Caselaw provides that "[u]ncertainty about the veracity of an informant can also be compensated for by detail of the statement or internal consistency of the statement and surrounding facts."[79] The facts and circumstances surrounding Bowen's alleged drug possession and distribution were sufficiently detailed in the affidavit. The agents tested Gooden's allegations by setting up carefully monitored controlled buys. These controlled buys yielded what she claimed they would: her purchase of crack cocaine from Bowens and Hampton. Based on her initial story and the subsequent controlled buys that supported her contentions, the agents believed Gooden to be a reliable source and received the search warrant for the trailer.

These facts supported the subsequent search of Bowens' residence as well. Bowens' residence was specifically implicated as a possible source of seizable items because Bowens told Gooden that he was out of drugs on March 28, 2000, and needed to go get more. His car appeared at his residence on the morning of March

---

[79] *United States v. Privette*, 947 F.2d 1259, 1262 (5th Cir. 1991).

29, 2000, and he later returned to the trailer.

The district court's finding that the agents did not intentionally or recklessly mislead the issuing judges is not clearly erroneous. "Absent evidence of an intentional material misrepresentation or omission in the affidavit, the warrant will not be invalidated."[80] Moreover, characterizing facts in a particular manner does not necessarily make it false; "if a statement can be read as true, it is not a misrepresentation."[81] Here, the agents described Gooden as a reliable source. Presumably, they did so because her allegations regarding Bowens and Hampton were confirmed by the controlled buys. The district court found that no material misrepresentation occurred, and Bowens does not sufficiently explain why the court clearly erred in so finding.

Given that the affidavits at issue provided more than "bare bones assertions," and that the judges had before them adequate "information to allow the conclusion that a fair probability existed that seizable evidence would be found" in the trailer and at Bowens' residence, the agents' reliance was objectively reasonable.[82] The good-faith exception applies, and there was no

---

[80] *United States v. McCarty*, 36 F.3d 1349, 1356 (5th Cir. 1994).

[81] *United States v. Cherry*, 50 F.3d 338, 341 (5th Cir. 1995).

[82] *United States v. Restrepo*, 994 F.2d 173, 189 (5th Cir. 1993); *see also Cisneros*, 112 F.3d at 1279.

43

error in denying the motion to suppress.

## C

Bowens claims that the district court clearly erred in finding that he distributed at least 500 grams of cocaine base and in applying an upward adjustment for possessing a dangerous weapon in relation to a drug trafficking crime. We review a district court's factual findings on which a defendant's sentence is based for clear error.[83] We review the court's application of the guidelines de novo.[84] A defendant's sentence may be based on conduct for which he was acquitted.[85] In resolving factual disputes, district courts "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."[86]

## 1

Bowens' primary assertion is that the witnesses on which the court based its finding of distribution of at least 500 grams of cocaine base were biased as a result of the government's offer of reduced sentences in exchange for their testimony. However, Bowens

---

[83] *United States v. Valencia*, 44 F.3d 269, 272 (5th Cir. 1995).

[84] *United States v. Carbajal*, 290 F.3d 277, 282–83 (5th Cir. 2002).

[85] *United States v. Carreon*, 11 F.3d 1225, 1241 (5th Cir. 1994).

[86] U.S. SENTENCING GUIDELINES MANUAL § 6A1.3(a).

44

cross-examined each witness and exposed their possible biases. It is well established that the court's credibility determinations are afforded great deference. The court had the benefit of knowing the witness's biases before sentencing Bowens. Finally, although Bowens was convicted of distributing 29.65 grams of cocaine base, Bowens concedes that his sentence may be based on conduct for which he was not convicted.

Despite Bowens' assertions, the court did not clearly err by finding that Bowens distributed at least 500 grams of cocaine base and sentencing him accordingly under § 2D1.1 of the Sentencing Guidelines. Seven government witnesses testified to Bowens' distribution, which combined for a total distribution of 873.67 grams of cocaine base between 1996 and 2000. Bowens cross-examined each witness, but offered no evidence rebutting the amount of distribution.

2

The court did not err by applying a two-level upward adjustment to Bowens' sentence for possessing a dangerous weapon in relation to a drug trafficking crime pursuant to § 2D1.1(b)(1) of the Sentencing Guidelines. The court did not clearly err in finding that Bowens used a weapon to threaten a government informant in an attempt to conceal his drug trafficking crimes.

A two-level upward adjustment is appropriate when a defendant possessed a dangerous weapon while possessing or trafficking

45

drugs.[87] The government bears the burden of proof to show a temporal and spatial relation between the weapon, the drug trafficking, and the defendant.[88] The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

The court based its holding on the testimony of Butler. Butler testified that about a week after the two controlled buys from Bowens, Bowens picked him up, drove him to the country, accused him of a being a snitch, and forced him to remove his clothes to prove he was not wearing a wire. Butler testified that Bowens then held a gun to him and said that he (Bowens) would kill Butler if he set him up. Bowens offered no evidence or testimony rebutting Butler's story, but Bowens notes that the government never found a weapon on him, in his car, or in his home.

Bowens contends that, assuming Butler's story to be true, "there lacks a sufficient nexus between the alleged possession [of a weapon] and Bowens' alleged cocaine trafficking." Bowens relies on *United States v. Cooper*,[89] a case in which the government asserted that although the defendant was not found with the firearm while in possession or while distributing the narcotics, the

---

[87] U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(b)(1).

[88] *United States v. Vasquez*, 161 F.3d 909, 912 (5th Cir. 1998).

[89] 274 F.3d 230 (5th Cir. 2001).

46

firearm was possessed during the alleged drug conspiracy.[90]  The

facts showed only that Cooper had a gun with him, but no drugs,

when he was arrested.  The panel rejected the government's theory,

explaining that it—

> would result in an enhancement any time a drug
> offender is found with a gun regardless of
> whether drugs are also found or otherwise
> connected to the gun's location as long as the
> government alleges that the defendant is
> involved in an ongoing conspiracy. Of course,
> such a holding would relieve the government of
> its burden of proving that a temporal and
> spatial relation existed between the weapon,
> the drug trafficking activity, and the
> defendant.

The government asserts that because "the threat to kill

[Butler] was clearly an effort to protect and promote BOWENS' drug

business and to fend off any interference from law enforcement,"

the possession was related spatially and temporally to the drug

offenses.  The government relies on *United States v. Booker*, which

applied the dangerous weapon enhancement to a defendant even though

the evidence did not establish that he possessed the weapon while

he also possessed narcotics.[91] The evidence established that Booker

possessed a gun during an argument with a former client about some

missing cocaine.[92]  Booker asserted that the enhancement was

inappropriate because the weapon possession was only involved in

---

[90] *Id*. at 246.

[91] 334 F.3d 406, 413 (5th Cir. 2003).

[92] *Id.*

settling a personal argument, but the panel disagreed, holding that because the incident occurred during the drug trafficking conspiracy, the weapon was possessed during "drug trafficking activity" within the meaning of § 2D1.1.[93]

Bowens' argument boils down to the proposition that unless a defendant is found in possession of a weapon while also possessing the narcotics, the enhancement is inappropriate.  This position is as overbroad as the government' position in *Cooper*.  The facts of this case – which have not been shown to be clearly erroneous – establish that Bowens used a dangerous weapon in an attempt to prohibit Butler from cooperating with the authorities in their ongoing drug investigation.  Bowens' threat occurred days after one of Butler's controlled buys of crack.  This is not *Cooper*, where the defendant was simply found in possession of a weapon and the government alleges the possession to be during an ongoing conspiracy.  Here, the defendant used a firearm in a threatening manner to protect his drug trafficking business.  It occurred soon after a controlled buy and during an ongoing investigation; as a result, the necessary temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant.  We find no error in the enhancement.

IV

Hampton raises three claims of error unique to his appeal:

---

[93] *Id.*

48

(1) that the district court erred in denying his motions to suppress evidence; (2) that prosecutorial misconduct during trial requires reversal; and (3) that the court reversibly erred in disqualifying his original counsel.  We find no reversible error.

A

1

Hampton challenges the Collins Street Warrant issued to search his sister's home, where he stayed while in Mississippi and where the controlled buys occurred.  The warrant application stated that crack cocaine was purchased from Hampton within the last twenty-four hours by a confidential informant at the Collins Street home and that the drug purchase occurred under the surveillance of the officers.

Hampton contends that the good-faith exception does not apply because Lieutenant Hudson did not inform the issuing magistrate that Gooden, the confidential informant, was a drug addict who had been placed under arrest.  This is the same argument made by Bowens, and we reach the same conclusion here.  Contrary to Hampton's assertions, the warrant application did not rely solely on an untested informant; the officers tested her allegations by setting up and executing the controlled buys.  The court's finding that the officers did not intentionally or recklessly mislead the issuing judges was not clearly erroneous.[94]  Given that the

---

[94] *See supra* Part III.B.

affidavits at issue provided more than "bare bones assertions," and that the judges had before them adequate "information to allow the conclusion that a fair probability existed that seizable evidence would be found" in the Collins Street home, the agents' reliance was objectively reasonable.[95] The good-faith exception applies, and there was no error in denying the motion to suppress.

2

Hampton asserts that the good-faith exception is inapplicable to the Hickory Street warrant issued to search his garage because (1) Lieutenant Hudson misrepresented the number of informants and the information provided by Dr. Schrader, (2) the affidavit mentions only the possibility of contraband, and (3) the affidavit does not adequately describe the contraband to be seized.

The Hickory Street affidavit repeated the allegations from the Collins Street warrant - that Hamtpon sold drugs the day before to an informant - and stated that when the informant attempted another buy, Hampton told her that he needed to get more drugs, leaving the residence and returning later. The application noted that several informants contended that Hampton previously went to California to get more drugs and that he stored the drugs in the garage. The warrant identified crack cocaine, weapons, money, and paraphernalia as the possible contraband. The district court found probable cause under the totality of the circumstances and in light of the

_____

[95] *Restrepo*, 994 F.2d at 189; *Cisneros*, 112 F.3d at 1279.

50

cocaine recovered from the Collins Street search.

Even assuming that the warrant is not supported by probable cause and excluding the disputed paragraph, the good-faith exception applies. The warrant rested on the controlled buy that occurred at the Collins Street home, on the fact that the Collins Street warrant netted a significant amount of contraband, and on allegations from sources that Hampton needed to get more cocaine. The warrant noted that Hampton's car left the Collins Street home and returned later that day and that Hampton controlled the garage to be searched. Given these circumstances, the warrant is not "so deficient in demonstrating probable cause that it renders an officer's belief in [the existence of probable cause] completely unreasonable."[96] The court did not err in denying the motion to suppress.

B

Hampton asserts that prosecutorial misconduct during redirect examination of Gooden and during rebuttal argument requires reversal. Because Hampton made no contemporaneous objection to either instance of alleged misconduct, we review for plain error.[97] To prevail, Hampton must show "1) an error; 2) that is clear or plain; 3) that affects the defendant's substantial rights; and 4)

---

[96] *Cisneros*, 112 F.3d at 1278.

[97] *United States v. McWaine*, 243 F.3d 871, 873 (5th Cir. 2001), *overruled on other grounds by United States v. Randle*, 304 F.3d 373 (5th Cir. 2002).

51

seriously affects the fairness, integrity or public reputation of judicial proceedings."[98]

Hampton alleges that the prosecutor improperly used the court to bolster the credibility of Gooden during her redirect examination. Hampton challenged Gooden's credibility during cross-examination, focusing on her signed admissions to Hampton that she planted the drugs on him. She explained that she signed these out of fear for her life. On redirect, the prosecution explained "[t]his is the time to tell the truth one way or the other and whatever that truth is. You have a federal judge to your right and to your left you have a United States Marshal. ... The federal judge who sits to your right will make sure nobody holds it against you that you tell the truth."

The alleged misconduct during rebuttal is the government's argument that Lieutenant Hudson, a local deputy sheriff, could not have planted 7.5 pounds of cocaine in Hampton's car, especially considering that such a large amount would be noticed if taken from the police station, that the amount is worth $340,000, and that a smaller amount would suffice if Lieutenant Hudson wanted to frame Hampton. Hampton contends the argument was improper and plain error because the government knew, through the excluded locker testimony of Chief White, that Lieutenant Hudson could in fact obtain a large quantity of drugs.

---

[98] *Id.*

52

We need not determine whether the acts at issue rise to the level of prosecutorial misconduct because, in light of the other evidence presented by the government supporting Hampton's convictions, Hampton cannot show plain error. Even if the statements during redirect and during rebuttal argument were improper, the error was not so egregious as to be clear or plain, and the substantial amount of evidence presented by the government indicates that these isolated statements in the course of a two-week trial did not affect Hampton's substantial rights.

C

Hampton claims that the district court reversibly erred when it disqualified his counsel, violating his Sixth Amendment right to retain his counsel of choice, without first conducting an evidentiary hearing to explore the nature and extent of his counsel's conflict of interest. He asserts that he could have waived any conflict and speculates that the government witnesses who were also represented by Hampton's attorneys would have also waived the conflict. The government, noting the "substantial latitude" given to district courts in finding an actual or potential conflict and refusing a defendant's waiver, contends that there is no requirement that a district court hold a hearing in every case and claims that the court here acted within its discretion. We agree with the government and find no abuse of discretion in the court's disqualification of Hampton's counsel.

53

Hampton initially retained Gail Thompson and Ronald Lewis. The government moved to disqualify both attorneys because (1) Thompson previously represented Melvin Shipp, a government witness seeking a Rule 35 sentence reduction, and (2) Lewis represented Clarence Dosey, a government witness also seeking a Rule 35 sentence reduction. Both Shipp and Dorsey testified that Hampton was a drug dealer selling drugs from the Collins Street home. Thompson and Lewis responded to the motion to disqualify and filed motions for reconsideration after the court's initial disqualification. The magistrate judge disqualified Thompson and Lewis, and the district affirmed the decision, explaining in its written order that,

> [i]n serving the best interests of Hampton, Lewis cannot also serve the best interests of Dorsey, one of his present clients, because he could very possibly be called upon to impeach Dorsey's credibility during Hampton's trial. Additionally, a strong possibility exists that Thompson, in order to serve Hampton's best interest, would have to impeach Shipp's credibility, thus breaching her attorney-client privilege with him.

Hampton relies on *United States v. Garcia*[99] and *United States v. Izydore*[100] for the proposition that if the lower court becomes aware of an alleged conflict of interest, the court must conduct a full evidentiary hearing. However, neither *Garcia* nor *Izydore*

---

[99] 517 F.2d 272 (5th Cir. 1975).

[100] 167 F.3d 213 (5th Cir. 1999).

54

provides such a rule.  In *Garcia*, the panel held that a defendant can waive the right to conflict-free representation and remanded to the district court to determine "whether the defendants competently and intentionally waive[d] their Sixth Amendment protections."[101] The nature of the conflict and the attempted waiver were undetermined.  In *Izydore*, the panel affirmed the district court's disqualification of counsel despite the defendant's attempted waiver because "a defendant's waiver does not necessarily preclude a district court from rejecting a defendant's counsel of choice when the overall circumstances of a case suggest a conflict of interest may develop."[102]

*Izydore* relied on the Supreme Court's opinion in *Wheat v. United States*, which explains that the constitutional right to choose one's counsel "is circumscribed in several important respects," and that all conflicts are not necessarily cured by a defendant's waiver because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."[103]  Given these considerations, the Supreme Court explained that district courts

---

[101] *Garcia*, 517 F.2d at 277.

[102] *Izydore*, 167 F.3d at 221 (citing *Wheat v. United States*, 486 U.S. 153, 163 (1988)).

[103] *Wheat*, 486 U.S. at 159-60.

55

must be provided substantial latitude in refusing waivers in situations where actual or even possible conflicts of interest may arise. "The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court."[104]

The district court here had the benefit of various motions from all parties and recognized the actual conflict of interest at hand. Hampton's attorneys needed to attack the credibility of government witnesses who would testify that Hampton had sold them drugs, but Hampton's attorneys had previously formed an attorney-client relationship with these government witnesses. Unlike *Garcia* and *Izydore*, the conflict was clear even without the benefit of a hearing: "No man can serve two masters." Contrary to Hampton's assertions, our caselaw does not mandate a full evidentiary hearing in every case. Bearing in mind the Supreme Court's instruction that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers,"[105] we cannot say that the court abused its discretion in disqualifying Hampton's original counsel.

V

Defendants' final argument is that assuming we find his

---

[104] *Id*. at 164.

[105] *Id*. at 159.

56

claimed errors to be harmless, their cumulative effect requires reversal under the cumulative error doctrine.

The cumulative error doctrine "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal."[106] The doctrine is rarely applied to reverse a defendant's conviction, although clear cumulative prejudice requires reversal.[107] In *United States v. Labarbera*, we applied the cumulative error doctrine to reverse a defendant's firearm conviction because of the prosecutor's repeatedly improper cross-examination.[108] The prosecutor insinuated that (1) the defendant was a drunk; (2) the defendant had been previously convicted of a firearms violation; (3) the prosecutor knew the defendant was involved in other illegal activity; and (4) the prosecutor had knowledge of the other illegal activity that could not be presented to the jury.[109] The court held that although "[i]ndividual instances such as these have sometimes escaped reversal under the harmless error rule," their cumulative effect convinced the court "that the defendant did not receive the

---

[106] *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998).

[107] *See United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978).

[108] *Id.*

[109] *Id.* at 108-110.

fair trial that he is entitled to under the law."[110]

The cumulative error doctrine is inapplicable to this case. The only error was the court's limitation of evidence regarding Lieutenant Hudson's possible motive to frame Bowens. This error alone does not create the aggregate effect that could result in a constitutionally infirm trial. Defendants' subjected Lieutenant Hudson to a thorough cross-examination, accusing him of planting the drugs; the jury considered the credibility of the witnesses and returned a conviction. The error does not combine to make the difficult showing of a denial of Bowens' constitutional right to a fair trial and require reversal.

VI

Finding no reversible error, we AFFIRM the convictions.

---

[110] *Id*. at 110.